# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DEMOCRATIC GOVERNORS
ASSOCIATION, a Washington, D.C., not
for profit corporation,

   *Plaintiff,*

    v.

MICHAEL J. BRANDI, in his official
capacity as Executive Director and General
Counsel of Connecticut's State Elections
Enforcement Commission; ANTHONY J.
CASTAGNO, in his official capacity as
Chair of Connecticut's State Elections
Enforcement Commission; SALVATORE
BRAMANTE, in his official capacity as
Vice Chair of Connecticut's State Elections
Enforcement Commission; PATRICIA
STANKEVICIUS, in her official capacity as
Commissioner of Connecticut's State
Elections Enforcement Commission;
STEPHEN PENNY, in his official capacity
as Commissioner of Connecticut's State
Elections Enforcement Commission;
MICHAEL J. AJELLO, in his official
capacity as Commissioner of Connecticut's
State Elections Enforcement Commission;
GEORGE JEPSEN, in his official capacity
as Connecticut Attorney General; and
KEVIN T. KANE, in his official capacity as
Connecticut's Chief State's Attorney,

    *Defendants.*

Civil Action No. _____

April 23, 2014

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, DEMOCRATIC GOVERNORS ASSOCIATION ("DGA"), by and through its attorneys, seeks a declaratory judgment and injunctive relief and alleges as follows:

### I.   NATURE OF THE ACTION

1.   DGA is the nation's association of Democratic governors.  Its major purpose is to promote Democratic governors and their policies throughout the United States.

2.   In 2014 and beyond, DGA intends to make independent expenditures that expressly advocate the election and defeat of candidates for Connecticut Governor and other functionally equivalent communications (hereinafter, "express advocacy conmmunications").  In addition to making express advocacy communications, DGA also seeks to communicate its positions on issues of public concern in Connecticut, but without expressly advocating the election or defeat of Connecticut officeholders and candidates or engaging in the functional equivalent of such express advocacy (hereinfter, "issue advocacy communications"); some such issue advocacy communications may nonetheless refer to officeholders and candidates, without advocating their election or defeat.  *See FEC v. Wis. Right to Life, Inc.*("*WRTL*"), 551 U.S. 449 (2007).

3.   Connecticut's campaign finance laws and declaratory rulings by the State Elections Enforcement Commission ("SEEC"), conflict with Supreme Court First Amendment precedent and place a cloud of uncertainty over what DGA may say or do without fear of prosecution.  Connecticut law imposes certain requirements on persons who make or obligate to make "independent expenditures" and "contributions." *See* Conn. Gen. Stat. § 9-601d.  But the

2

state's sweeping definition of "expenditure," *id.* § 9-601b, and SEEC's unconstitutional

interpretation as to when an expenditure is treated as a "contribution" to a candidate or political

party that is subject to campaign finance limits and restrictions, *id.* § 9-601c, SEEC Declaratory

Rulings 2014-01 (Exhibit A) and 2014-02 (Exhibit B) (collectively, the "Challenged Provisions

and Rulings"), create uncertainty as to what kinds of expenditures or speech DGA may make

without threat of prosecution.

      4.     The Supreme Court has held that the government has no compelling interest in

regulating speech that does not qualify as express advocacy or its functional equivalent. *See*

*WRTL*, 551 U.S. at 452.

      5.     Yet Connecticut campaign finance law regulates "expenditures," and defines that

term so broadly as to reach speech that the Constitution does not allow it to regulate. *See* Conn.

Gen. Stat. § 9-601b. Indeed, the definition of "expenditure" is so broad as to include most

communications that refer to a candidate for public office, even if such communications do not

include express advocacy or its functional equivalent. *See id.* § 9-601b(a)(2). This expansive

definition violates the Federal Constitution.

      6.     The Supreme Court has also held that the right to make independent expenditures

is a core First Amendment right. *Buckley v. Valeo*, 424 U.S. 1, 45 (1976). The government may

not limit or burden that right by presuming coordination between the sponsor and the benefitting

candidate, or by finding that a particular expenditure is coordinated based on collaboration on

programs or activities other than the expenditure itself. *Colo. Republican Fed. Campaign*

*Comm. v. FEC* ("*Colorado I*"), 518 U.S. 604, 614 (1996). Rather, a candidate and a sponsor must

coordinate with regard to a *specific* expenditure before the state may limit that expenditure by subjecting it to the source and amount limits that apply to contributions. *Id.*

7. To ensure that DGA's expenditures are independent, DGA has established a firewall policy designed and implemented to prohibit the flow of information between (1) employees, consultants and other individuals providing services to DGA related to the expenditure; and (2) the candidate or agents of the candidate benefiting from the expenditure.

8. Yet even when a candidate and DGA interact in ways having nothing to do with particular Connecticut expenditures, SEEC still presumes coordination in some cases, *see* Conn. Gen. Stat. § 9-601c(c), and reserves the power to find it in others, *see* Ex. B. In SEEC's opinion, a "close relationship" between a candidate and a spender and their sharing of "common values and goals" is sufficient, without more, to justify state investigation of protected political speech. *Id.* at 6. And the facts to which SEEC may look to assert a claim of coordination "are not limited" even to these. *Id.* By looking past the expenditure in question, and scrutinizing instead other forms of association between DGA and candidates who are involved in its national activities, the Challenged Provisions and Rulings violate the First and Fourteenth Amendments.

9. As a result, DGA is suffering irreparable injury to its First Amendment rights. And, until this Court acts, DGA will continue to suffer their infringement. DGA has been forced into a constitutionally untenable choice: it can avoid the protected speech in which it seeks to engage; it can forego the support and participation of Connecticut's citizens in raising the funds that it needs to maintain a robust national program; or it can entertain the very real threats of investigation, fines and criminal prosecution. The resulting chill on DGA's activities constitutes

4

irreparable harm.  That harm is only compounded as Election Day approaches.  With each day that passes, DGA loses opportunities to engage in constitutionally protected political activity.

10.     For these reasons, DGA seeks a declaration that the Challenged Provisions and Rulings are unconstitutional, whether on their face or as interpreted by SEEC, and preliminary and permanent injunctions forbidding Defendants from enforcing them.

## II.     JURISDICTION AND VENUE

11.     This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  This Court also has the power to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     This Court has personal jurisdiction over Defendants, all of whom are sued in their official capacities and are either elected officials in Connecticut or members of SEEC.  All Defendants work or reside in Connecticut.

14.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the action occurred in this judicial district.

## III.     PARTIES

15.     Plaintiff DGA is an independent, voluntary, unincorporated political organization whose mission is to support Democratic governors and candidates across the nation.  It is organized as a not-for-profit unincorporated association under District of Columbia law and is exempt from federal taxation under Section 527 of the Internal Revenue Code.  Founded in 1983,

5

it serves as the principal political and public policy organization of the nation's Democratic governors. DGA's membership consists of Democratic governors in the United States and its territories. As the only organization dedicated to electing Democratic governors and candidates nationwide, DGA participates at all levels of campaigns, from providing resources to fund operations, to helping articulate and deliver campaign messaging. DGA also provides public policy guidance to Democratic governors and candidates, sponsoring events throughout the year that bring together Democratic governors, activists, and other stakeholders to discuss key issues facing the states, and tries to shape the issue environment by advancing progressive policy outcomes across the country. It provides strategic advice to gubernatorial campaigns, highlights the achievements of Democratic governors, and criticizes the policy agenda of Republican governors. As discussed in further detail herein, the Challenged Provisions and Rulings threaten to chill both DGA's associational activity and its speech related to Connecticut elections.

16.     Defendant MICHAEL J. BRANDI is the Executive Director and General Counsel of SEEC, which is responsible for administrating and enforcing provisions of the state election laws including the Challenged Provisions and Rulings. SEEC also has the power to investigate possible violations of election laws, inspect campaign finance records and reports, refer evidence of violations to the Chief State's Attorney or the Attorney General, levy civil penalties for election law violations, and issue advisory opinions. *See* Conn. Gen. Stat. §§ 9-603; 9-7b. Mr. Brandi is sued in his official capacity.

17.     Defendant ANTHONY J. CASTAGNO is the Chair of SEEC. He is sued in his official capacity.

6

18.     Defendant SALVATORE BRAMANTE is the Vice Chair of SEEC.  He is sued in his official capacity.

19.     Defendant PATRICIA STANKEVICIUS is a Commissioner of SEEC.  She is sued in her official capacity.

20.     Defendant STEPHEN PENNY is a Commissioner of SEEC.  He is sued in his official capacity.

21.     Defendant MICHAEL J. AJELLO is a Commissioner of SEEC.  He is sued in his official capacity.

22.     Defendant GEORGE JEPSEN is the Connecticut Attorney General and is responsible for prosecuting violations of Connecticut's election laws.  *See* Conn. Gen. Stat. § 9-7b.  He is sued in his official capacity.

23.     Defendant KEVIN T. KANE is the Chief State's Attorney and is responsible for prosecuting violations of Connecticut's election laws.  *See id.*  He is sued in his official capacity.

## IV.     STATEMENT OF FACTS

### A.     DGA's National Activities

24.     DGA supports the objectives of Democratic governors, gubernatorial candidates and the Democratic Party through several programs and activities.

25.     For example, DGA makes direct contributions to gubernatorial candidates and other organizations whose objectives are similar to its own.  DGA makes independent expenditures that expressly advocate the election or defeat of specific candidates or contain the functional equivalent of express advocacy.  DGA also sponsors communications that discuss

7

issues of public concern, do not expressly advocate the election or defeat of any candidate, and do not contain the functional equivalent of express advocacy. DGA incurs rent, personnel, overhead, general administrative, fundraising and other day-to-day costs to support its programs and activities. DGA engages in all of these programs and activities primarily outside Connecticut.

26.     DGA engages in fundraising on an ongoing basis to support its programs and activities. Its members often participate in that fundraising, soliciting funds on behalf of DGA or through other forms of participation, such as appearing as the keynote speaker at a DGA fundraising event. DGA relies heavily on its members to raise funds on its behalf. The extent to which DGA can engage in these programs and activities depends directly on its members' ability to raise funds on its behalf. If DGA were not able to utilize its members to raise funds in support of its nationwide programs and activities, its ability to function effectively would be severely compromised.

27.     With the assistance of its members and adherents, including current or future candidates for Connecticut office, DGA intends to solicit funds in support of its national programs and activities. These funds would not be designated to promote or oppose Connecticut candidates, nor would they be given with the intent that they be used to promote or oppose Connecticut candidates. These funds are called "non-earmarked funds." *See* Ex. B.

8

**B.     DGA's Connecticut Activities**

28.     Connecticut's current Governor is a member of DGA and, in 2010, DGA made disbursements that SEEC later characterized as "independent expenditures in support of his election."

29.     In 2014, Connecticut is among the thirty-six states and three territories in the United States holding gubernatorial elections. Connecticut is also a forum for several major debates, with national significance, over issues of public policy, including recent legislation to raise the minimum wage to $10.10 per hour. Connecticut was the first state in the country to raise the minimum wage to $10.10, the figure that President Obama has called on Congress to pass on a national level.

30.     In the absence of the Challenged Provisions and Rulings, in 2014, and in the future, DGA would sponsor independent communications that expressly advocate the election or defeat of Connecticut candidates for Governor or contain the functional equivalent of express advocacy. *See* Conn. Gen. Stat. § 9-601c. Further, DGA would make "covered transfers" as that term is defined under Connecticut law, Conn. Gen. Stat. § 9-601(29)(A), to other political committees for the purpose of making independent expenditures in Connecticut. Finally, DGA would make communications that discuss issues of public concern in Connectiut and refer to candidates for Governor in Connecticut, but do not expressly advocate the election or defeat of any candidate, and do not contain the functional equivalent of express advocacy.

31.     Some of these communications, whether made directly by DGA or by the political committees to which it makes covered transfers, would refer to candidates who have raised or

9

will raise non-earmarked funds for DGA's programs and activities, or would refer to these candidates' opponents.

32.     So that its independent expenditures and those supported by its covered transfers will not be made in concert, coordination, or consultation with Connecticut candidates or parties, DGA has established a firewall policy designed and implemented to prohibit the flow of information between (1) employees, consultants and other individuals providing services to DGA related to the expenditure; and (2) the candidate or agents of the candidate benefiting from the expenditure.  If or when DGA makes or becomes obligated to make independent expenditures, it will file reports as required by Connecticut law.

33.     Despite the steps taken by DGA to avoid actual coordination regarding any future expenditure, Connecticut law and SEEC's interpretation of that law still restrict DGA from engaging in these constitutionally protected activities.

34.     Indeed, the Challenged Provisions and Rulings are so broad that if DGA makes any independent expenditures or covered transfers this election cycle, it could find itself the subject of an investigation under the State's campaign finance laws based simply on the fact that the current Governor has engaged in solicitation or fundraising on DGA's behalf in the years since 2010.

## C.     Connecticut's Statutory Restrictions on Independent Expenditures

35.     Last year, the Connecticut General Assembly enacted Act No. 13-180, titled AN ACT CONCERNING DISCLOSURE OF INDEPENDENT EXPENDITURES AND

CHANGES TO OTHER CAMPAIGN FINANCE LAWS (the "Act").  2013 Conn. Legis. Serv. P.A. 13-180 (H.B. 6580).

36.     The Act amended Connecticut's election laws and established a new regulatory scheme governing persons that make independent expenditures, and included several provisions relevant to this litigation, each of which is set forth below.

37.     The Act amended the definition of "expenditure" to mean:

(1)     Any purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value, when made to promote the success or defeat of any candidate seeking the nomination for election, or election, of any person or for the purpose of aiding or promoting the success or defeat of any referendum question or the success or defeat of any political party;

(2)     Any communication that (A) refers to one or more clearly identified candidates, and (B) is broadcast by radio, television, other than on a public access channel, or by satellite communication or via the Internet, or as a paid-for telephone communication, or appears in a newspaper, magazine or on a billboard, or is sent by mail; or

(3)     The transfer of funds by a committee to another committee.

Conn. Gen. Stat. § 9-601b(1).

38.     The Act maintains the definition of "independent expenditure" to mean "an expenditure, as defined in section 9-601b, that is made without the consent, coordination, or consultation of, a candidate or agent of the candidate, candidate committee, political committee or party committee." *Id*. § 9-601c(a).

39.     The Act defines the term "covered transfer" to mean "any donation, transfer or payment of funds by a person to another person if the person receiving the donation, transfer or

payment makes independent expenditures or transfers funds to another person who makes independent expenditures." *Id.* § 9-601(29)(A).

40.     The Act states that "[a]ny person, as defined in section 9-601 of the general statutes, as amended by this act, may, unless otherwise restricted or prohibited by law, including, but not limited to, any provision of chapter 155 or 157 of the general statutes, make unlimited independent expenditures, as defined in section 9-601c of the general statutes, as amended by this act, and accept unlimited covered transfers, as defined in said section 9-601." *Id.* § 9-601d(a).

41.     However, the Act significantly amended Connecticut General Statutes Section 9-601c, which sets forth several "rebuttable presumptions" for SEEC to apply when it "evaluates an expenditure to determine whether such expenditure is an independent expenditure." *Id.* As amended by the Act, section 9-601c(b) provides that "there shall be a rebuttable presumption that the following expenditures are *not* independent expenditures" (emphasis added):

(1)     An expenditure made by a person in cooperation, consultation or in concert with, at the request, suggestion or direction of, or pursuant to a general or particular understanding with (A) a candidate, candidate committee, political committee or party committee, or (B) a consultant or other agent acting on behalf of a candidate, candidate committee, political committee or party committee;

(2)     An expenditure made by a person for the production, dissemination, distribution or publication, in whole or in substantial part, of any broadcast or any written, graphic or other form of political advertising or campaign communication prepared by (A) a candidate, candidate committee, political committee or party committee, or (B) a consultant or other agent acting on behalf of a candidate, candidate committee, political committee or party committee;

12

(3)     An expenditure made by a person based on information about a candidate's, political committee's, or party committee's plans, projects or needs, provided by (A) a candidate, candidate committee, political committee or party committee, or (B) a consultant or other agent acting on behalf of a candidate, candidate committee, political committee or party committee, with the intent that such expenditure be made;

(4)     An expenditure made by an individual who, in the same election cycle, is serving or has served as the campaign chairperson, treasurer or deputy treasurer of a candidate committee, political committee or party committee benefiting from such expenditure, or in any other executive or policymaking position, including as a member, employee, fundraiser, consultant or other agent, of a candidate committee, political committee or party committee;

(5)     An expenditure made by a person or an entity on or after January first in the year of an election in which a candidate is seeking public office that benefits such candidate when such person or entity has hired an individual as an employee or consultant and such individual was an employee of or consultant to such candidate's candidate committee or such candidate's opponent's candidate committee during any part of the eighteen-month period preceding such expenditure;

(6)     An expenditure made by a person for fundraising activities (A) for a candidate, candidate committee, political committee or party committee, or a consultant or other agent acting on behalf of a candidate, candidate committee, political committee or party committee, or (B) for the solicitation or receipt of contributions on behalf of a candidate, candidate committee, political committee or party committee, or a consultant or other agent acting on behalf of a candidate, candidate committee, political committee or party committee;

(7)     An expenditure made by a person based on information about a candidate's campaign plans, projects or needs, that is directly or indirectly provided by a candidate, the candidate's candidate committee, a political committee or a party committee, or a consultant or other agent acting on behalf of such candidate,

13

candidate committee, political committee or party committee, to the person making the expenditure or such person's agent, with an express or tacit understanding that such person is considering making the expenditure;

(8)     An expenditure made by a person for a communication that clearly identifies a candidate during an election campaign, if the person making the expenditure, or such person's agent, has informed the candidate who benefits from the expenditure, that candidate's candidate committee, a political committee or a party committee, or a consultant or other agent acting on behalf of the benefiting candidate or candidate committee, political committee, or party committee, concerning the communication's contents, or of the intended audience, timing, location or mode or frequency of dissemination. As used in this subdivision, a communication clearly identifies a candidate when that communication contains the name, nickname, initials, photograph or drawing of the candidate or an unambiguous reference to that candidate, which includes, but is not limited to, a reference that can only mean that candidate; and

(9)     An expenditure made by a person or an entity for consultant or creative services, including, but not limited to, services related to communications strategy or design or campaign strategy or to engage a campaign-related vendor, to be used to promote or oppose a candidate's election to office if the provider of such services is or has provided consultant or creative services to such candidate, such candidate's candidate committee or an agent of such candidate committee, or to any opposing candidate's candidate committee or an agent of such candidate committee after January first of the year in which the expenditure occurs. For purposes of this subdivision, communications strategy or design does not include the costs of printing or costs for the use of a medium for the purpose of communications. For purposes of this subdivision, campaign-related vendor includes, but is not limited to, a vendor that provides the following services: Polling, mail design, mail strategy, political strategy, general campaign advice or telephone banking.

14

42.     As amended by the Act, Section 9-601c(c) provides that "the following shall not be presumed to constitute evidence of consent, coordination or consultation" for the purpose of determining whether an expenditure qualifies as an "independent expenditure": "(1) Participation by a candidate or an agent of the candidate in an event sponsored by the entity [that makes the expenditure], unless such event promotes the success of the candidate's candidacy or the defeat of the candidate's opponent, or unless the event is during the period that is forty-five days prior to the primary for which the candidate is seeking nomination for election or election to office; (2) membership of the candidate or agent of the candidate in the entity, unless the candidate or agent of the candidate holds an executive or policymaking position within the entity after the candidate becomes a candidate; or (3) financial support for, or solicitation or fundraising on behalf of the entity by a candidate or an agent of the candidate, unless the entity has made or obligated to make independent expenditures in support of such candidate in the election or primary for which the candidate is a candidate." *Id.* § 9-601c(c).  SEEC has interpreted sub-section (3) to mean that "if the maker [of expenditures] had made them in the past, then said fundraising might be used as evidence of coordination."  Ex. B at 5.

43.     Section 9-601c(d) provides: "When the [SEEC] evaluates an expenditure to determine whether such expenditure is an independent expenditure, the commission shall consider, as an effective rebuttal to the presumptions provided in subsection (b) of this section, the establishment by the person making the expenditure of a firewall policy designed and implemented to prohibit the flow of information between (1) employees, consultants or other

15

individuals providing services to the person paying for the expenditure, and (2) the candidate or agents of the candidate." *Id.* § 9-601c(d).

44.     A mere allegation of coordination, even if unfounded, can result in a SEEC investigation that chills future political activity and requires the respondents and witnesses to incur significant burden and expense.

**D.     SEEC's Chilling Interpretation of the Connecticut Restrictions**

45.     On October 9, 2013, legal counsel for DGA submitted a letter to SEEC requesting a declaratory ruling on SEEC's interpretation of Act No. 13-180 in several regards. *See* Letter from Marc Elias to SEEC, Legal Compliance Unit (Oct. 9, 2013) (<u>Exhibit C</u>). As is relevant to this litigation, the letter asked SEEC to confirm "[t]hat a candidate's non-earmarked fundraising activity for an entity that makes 'covered transfers' is not a basis to find coordination between the candidate and the entity receiving such covered transfers." *Id.* at 2.

46.     The letter proffered that DGA's counsel had clients who intend to accept contributions from individuals, corporations, labor unions, and Section 527 organizations, and spend those funds on independent expenditures in connection with Connecticut state elections in 2014. *Id.* It further proffered that "[t]hese organizations would not make contributions to, or coordinated expenditures with, candidates or political party committees in connection with Connecticut state elections (or to political committees that make contributions to such candidates or committees), nor would their expenditures be made in concert, coordination, or consultation with a candidate, candidate's agent, candidate committee, or party committee," as those terms are defined by the Connecticut General Statutes. *Id.* It confirmed that these organizations' "only

16

activity to influence elections in Connecticut would be the making of independent expenditures," and "[w]hen these organizations make or become obligated to make independent expenditures, they would file reports in accordance with Act No. 13-180 § 8." *Id.*

47.     Counsel for DGA requested "a ruling that a candidate's non-earmarked fundraising for an entity that makes a covered transfer to another entity is not a basis to find coordination between the candidate and the entity receiving the covered transfer." *Id.* at 9. Counsel explained that, "[b]y non-earmarked, we mean fundraising for the group's general purposes rather than funds earmarked specifically for covered transfers." *Id.*

48.     On March 19, 2014, SEEC adopted Declaratory Ruling 2014-02 in response to DGA Counsel's request.  There, SEEC considered the interpretation of Section 9-601c's "examples of behavior" that SEEC "can presume to be coordination (subject to rebuttal) between the person making the expenditure and the candidate." Ex. B at 4.

49.     SEEC opined that "[u]nderstanding that the petitioner's question does not concern fundraising for the maker of an independent expenditure, but fundraising for a group that supplies funds to the maker, the intent of the statute is easily extrapolated: a candidate's non-earmarked fundraising activity for an entity that makes 'covered transfers' is not *presumed* to establish coordination between the candidate and the entity receiving such covered transfers." *Id.*

50.     Nevertheless, SEEC would not affirm that a candidate's non-earmarked fundraising for an organization making covered transfers provided no basis for a claim of coordination.  It said instead that "it is foreseeable that [fundraising] might constitute evidence of

17

a 'general understanding' among the actors," including, presumably, the candidate, the entity for which the candidate raised funds, and the entity that received covered transfers, and therefore be evidence of coordination. *Id.* at 5.

51.     To support its conclusion, SEEC relied on (1) Connecticut's definition of expenditure, which SEEC interprets to go beyond "those outlays of funds for communications," Ex. A at 4 n.5, and to reach "any attendant expenditures for" any "activities ... done with the intention that the result will be a communication that fits the definition of an independent expenditure," Ex. B at 6; (2) SEEC's assertion that "[m]aking an independent expenditure involves far more than simply paying for a communication," and that "[f]undraising is an indispensible part of making independent expenditures, which are fundamentally, the purposeful expenditure of funds, and not simply the end product"; (3) language in *McConnell v. FEC*, 540 U.S. 93 (2003), in which, SEEC said, the Supreme Court "recognized 'the substantial threat of corruption or its appearance posed by donations to *or at the behest* of ... candidates and officeholders"; and (4) advisory opinions issued by the Minnesota Campaign Finance and Public Disclosure Board and the Kentucky Registry of Election Finance, interpreting Minnesota and Kentucky laws, respectively. *See id.* at 5-6 (ellipses in original).

52.     SEEC thus claimed essentially unfettered discretion to find coordination based on the general relationship between an organization and a candidate, rather than on the contacts regarding any particular expenditure: "Establishing proof of a general or implicit understanding as set forth in the first rebuttable presumption of coordination under our statutes must necessarily require consideration of ancillary facts ... [and s]uch facts may include, but are not limited to the

18

expenditure maker's history of making expenditures or covered transfers and for whom they were made, common personnel of intermediaries and expenditure makers, past relationships and actions of all actors, as well as the timing and amount of fundraising, whether for covered transfers or expenditures." *Id.* at 6.

53.     Before SEEC finalized Declaratory Ruling 2014-02, DGA's counsel pointed out in written comments that none of the authority that SEEC relied upon to conclude that solicitation or fundraising could constitute evidence of coordination actually supported that proposition, and requested that SEEC reconsider. Letter from Marc Elias to SEEC, Legal Compliance Unit 6-7 (Mar. 10, 2014) (Exhibit D). SEEC declined to do so. *See generally* Ex. B.

**E.     The Constitutional Harm to DGA From the Challenged Provisions and Rulings**

54.     DGA wants to continue to raise non-earmarked funds to support its national programs and activities with the assistance of current or future candidates for Connecticut office. DGA also wants to sponsor "express advocacy" communications; make "covered transfers" to other political committees that sponsor such communications; and sponsor "issue advocacy" communications that refer to candidates for nonfederal office in Connecticut but do not expressly advocate the election or defeat of any candidate and do not contain the functional equivalent of express advocacy. Some of these communications, whether sponsored by DGA or by organizations that received covered transfers from DGA, will refer to candidates who raised non-earmarked funds for DGA, or to their opponents. The First and Fourteenth Amendments to the United States Constitution protect DGA's right to engage in this desired course of conduct.

19

55.     Yet, if DGA engages in its desired course of conduct, it runs a serious risk of being prosecuted for violating the Challenged Provisions and Rulings.  DGA faces an even greater risk of protracted and costly investigation for engaging in what is lawful, First Amendment-protected conduct.

56.     The Challenged Provisions and Rulings present DGA with three choices, none of which is constitutionally tolerable.  DGA can stand down from its desired program of express and issue advocacy communications and covered transfers, in order to enjoy the support of a member and its adherents in raising funds for its national programs and activities.  Or, DGA can exclude its Connecticut member and adherents from soliciting or fundraising for its national programs and activities, and thereby have substanitally fewer funds to engage in the same programs and activities.  Or, finally, DGA can court the threats of investigation, fines and criminal prosecution if it includes its Connecticut member and adherents in raising funds for its national programs and activities, *and* if it also engages in its desired program of express and issue advocacy communications and covered transfers.  This predicament chills DGA's rights of speech and association.  It violates the First Amendment.

57.     But for the Challenged Provisions and Rulings, the threat of investigation, and the penalties imposed for violation, DGA would solicit and raise non-earmarked funds with the assistance of candidates for Connecticut office; sponsor express and issue advocacy communications that refer to Connecticut candidates, including those who raise non-earmarked funds for DGA's programs and activities; and make covered transfers to other entities.

20

58.     The longer DGA remains subject to these unconstitutional restrictions on its speech and associational rights, the greater the harm to DGA's ability to engage in its desired programs and activities.  DGA would like to be able to sponsor express advocacy and issue advocacy communications and make covered transfers right now.  The general election is only seven months away, and DGA must have the opportunity both to raise funds and to sponsor these communications and make covered transfers, as the law allows it to do.

59.     The uncertainties created by the Challenged Provisions and Rulings severely burden DGA's First Amendment right to engage in political speech.  The Provisions and Rulings also severely burden DGA's First Amendment right to associate with its own members, who have traditionally solicited or fundraised on DGA's behalf.

60.     Through investigation, fines and potential criminal prosecution, DGA faces imminent and impending injury if it exercises its rights to free speech and association.  DGA is unwilling to expose itself to the legal consequences that will result from its engaging in protected activities without an order guaranteeing its rights.  Therefore, the chilling effect on DGA's First Amendment rights to free speech and association is an actual, immediate and irreparable constitutional injury.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Violation of the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983 - Definition of "Expenditure" Is Unconstitutionally Overbroad and Vague**

61.     DGA re-alleges and incorporates by reference the allegations of paragraphs 1 through 60 above, as though fully set forth herein.

62.     As the parties responsible for implementation and enforcement of the Challenged Provisions and Rulings, Defendants are liable for any action taken pursuant to those Provisions and Rulings that violates DGA's constitutional rights.

63.     The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, directs that the government "shall make no law … abridging the freedom of speech." U.S. Const. amend. I.

64.     When the Government restricts speech through political contributions or expenditures, it bears the burden of showing that the restrictions "further the permissible objective of preventing *quid pro quo* corruption." *McCutcheon v. FEC*, 134 S.Ct. 1434, 1452 (Apr. 2, 2014).

65.     Any statutory limits on core constitutional speech must be precise, objective, and narrow. *Buckley*, 424 U.S. at 41-44, 78-80; *FEC v. Mass. Citizens for Life, Inc.* ("*MCFL*"), 479 U.S. 238, 245-50 (1986); *McConnell v. FEC*, 540 U.S. 93, 194 (2003). This is true under any circumstance, but particularly so where, as here, a misunderstanding of what the limitation reaches could result in criminal or civil prosecution. *See Buckley*, 424 U.S. at 41-42.

22

66.     Imprecise, subjective, or overbroad limitations on speech irreparably harm both potential speakers and their audience, because they unconstitutionally induce the speaker to engage in self-censorship, causing them to "hedge and trim" and "steer far wider of the [forbidden] zone … than if the … forbidden areas were clearly marked." *Id.* at 43, 41 n.48.  The result is not only unconstitutionality limited speech, but a less robust public debate, which defeats the core purpose of the First Amendment.  "In this critical area of political discourse, the speaker cannot be compelled to risk … prosecution with no more assurance of impunity than his prediction that what he says will be found susceptible of some 'reasonable interpretation.'" *WRTL*, 551 U.S. at 493-94.  As with when a law is too vague, "'[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech – harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.'" *Id.* at 494 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

67.     The Supreme Court has held that a definition of expenditure violates the Constitution when it reaches speech beyond "express advocacy," which is defined as speech that explicitly advocates for the election or defeat of a clearly identified candidate, or its "functional equivalent." *See id.* at 455; *Buckley*, 424 U.S. at 43-44.

68.     Applying this standard, the Court has repeatedly held that language similar to that which Connecticut uses to define "expenditures" is impermissibly subjective, vague, and overbroad in violation of the First Amendment. *See, e.g.*, *Buckley*, 424 U.S. at 43-44, n.52, 78-80 (holding federal statutory definition of "expenditure" using the language "for the purpose of

23

… influencing" facially vague and overbroad); *MCFL*, 479 U.S. at 248-50 (holding federal statutory prohibition on corporate expenditures "in connection with any election" vague and overbroad). *See also McConnell*, 540 U.S. at 192 (reaffirming *Buckley* and *MCFL*).

69.     Connecticut's definition of expenditure, which turns on the phrase "for the purpose of aiding or promoting the success or defeat of any candidate," Conn. Gen. Stat. § 9-601b(1), is substantively indistinguishable from the language that the *Buckley* Court found unconstitutionally vague and overbroad.

70.     Moreover, Connecticut's definition of expenditure, which sweeps into its ambit *any* communication that refers to a candidate for office, even if the communication lacks express advocacy or its functional equivalent – unless it is made by an entity registered with the state as a "lobbyist" and occurring during a legislative session or more than ninety days before a primary or general election – is far broader in scope than those provisions first narrowed and then struck down in *Buckley*, *MCFL* and *WRTL*..

71.     As a result, and in the face of criminal penalties for violating Connecticut's campaign finance laws, DGA and other similarly situated organizations are chilled from exercising their First Amendment rights, because state law does not allow them to engage in protected non-electoral speech without registering as a political committee or a lobbyist, and complying with the panoply of statutes and regulations that govern such activities.

72.     Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive DGA of rights secured to it by the United States Constitution and protected by 42 U.S.C. § 1983.

73.     DGA's injury will continue into the future unless the challenged provision is narrowly interpreted and Defendants are enjoined from enforcing it more broadly than is constitutionally permissible.

## SECOND CLAIM FOR RELIEF

**Violation of the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983 – Non-Earmarked Solicitation or Fundraising Cannot Constitutionally Give Rise to a Presumption of Coordination or Constitute Evidence of Coordination**

74.     DGA re-alleges and incorporates by reference the allegations of paragraphs 1 through 73 above, as though fully set forth herein.

75.     An organization such as DGA cannot be compelled to forfeit its rights to engage in protected speech and association outside Connecticut, nor can it be forced to accept limits on those activities, as a condition of making Connecticut independent expenditures and covered transfers. *See WRTL*, 551 U.S. at 472 ("WRTL does not forfeit its right to speak on issues simply because in other aspects of its work it also opposes candidates who are involved with those issues."); *EMILY's List v. FEC*, 581 F.3d 1, 12 (D.C. Cir. 2009) ("A non-profit that makes expenditures to support … candidates does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions"); *see also McConnell*, 540 U.S. at 216 (holding that even when a political party chooses to coordinate with candidates "[t]he consequence of the larger coordinated expenditure is not a complete prohibition of any independent expenditure, but the forfeiture of the right to make independent expenditures for express advocacy").

76.     The Supreme Court has rejected arguments that "coordination" between a candidate and an entity making an independent expenditure may be shown by reference to the

25

speaker's general "practice to … coordinate with the candidate campaign strategy" and to make available to candidates "all of [its] assets." *Colorado I*, 518 U.S. at 614 (internal quotation marks and citations omitted).

77.     Per this precedent, the *only* appropriate inquiry into whether there has been improper coordination is to examine the specific independent expenditure at issue. *See id.* (rejecting as evidence of coordination "statements … [that] are general descriptions of … practice" and neither "refer to the advertising campaign at issue here or to its preparation").

78.     Thus, as a matter of law, the state cannot presume coordination between an entity like DGA with a candidate, simply because the candidate assisted it in non-earmarked solicitation or fundraising. *See id.* at 619 ("The question … is whether the Court of Appeals erred as a legal matter in accepting the Government's conclusive presumption that all party expenditures are 'coordinated.'  We believe it did.").

79.     Because the only evidence relevant to a finding of coordination is evidence specific to the circumstances of a particular expenditure, SEEC cannot constitutionally use the fact that a candidate engaged in non-earmarked solicitation or fundraising for an entity that later made or supported independent expenditures, by itself, as a basis for investigation, fines or prosecution.

80.     Indeed, "[a]s the state attempts to regulate entities further and further removed from the candidate, the state interest in preventing corruption necessarily decreases." *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008).  "[A] donor to an independent expenditure committee . . . is even further removed from political candidates [than the

committee] and may not be limited in his ability to contribute to such committees." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013). Thus, SEEC has an even weaker basis to investigate or find coordination simply because a candidate engages in solicitation or fundraising activity for an entity that makes covered transfers to another entity, which in turn makes independent expenditures in support of that candidate.

81.     Any statutory presumption of coordination based on solicitation or fundraising, or that uses solicitation or fundraising as *prima facie* evidence of coordination, inherently and severely burdens the associational rights of DGA, its members and its adherents. The Challenged Provisions and Rulings stymie DGA's efforts to engage in independent expenditures (either on its own or by engaging in covered transfers to others) by restricting its fundraising efforts, while at the same time infringing upon DGA's and candidates' right to associate politically and assist in DGA's larger efforts on behalf of candidates.

82.     Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive DGA of rights secured to it by the United States Constitution and protected by 42 U.S.C. § 1983.

83.     DGA's injury will continue into the future unless the Court grants its requested declaratory and injunctive relief.

## THIRD CLAIM FOR RELIEF

### DGA Is Entitled to Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 and 2202

84.     DGA re-alleges and incorporates by reference the allegations of paragraphs 1 through 83 above, as though fully set forth herein.

85.     An actual controversy exists between DGA and Defendants regarding the constitutionality of the Challenged Provisions and Rulings.

86.     DGA is entitled to a declaration of its rights with regard the Challenged Provisions and Rulings and any further necessary or proper relief against Defendants, pursuant to 28 U.S.C. §§ 2201 and 2202.

## FOURTH CLAIM FOR RELIEF

### DGA Is Entitled to Preliminary and Permanent Injunctive Relief

87.     DGA re-alleges and incorporates by reference the allegations of paragraphs 1 through 86 above, as though fully set forth herein.

88.     DGA seeks to vindicate and protect well-established First Amendment rights, and the case law referenced above from the Supreme Court directly supports its position. Accordingly, DGA has a strong likelihood of success on the merits of this case.

89.     DGA has suffered, and will continue to suffer, real, immediate, and irreparable injury as a result of Defendants' enforcement and interpretation of the Challenged Provisions and Rulings, which prohibit DGA from freely engaging in its core constitutional rights of political speech and association. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Every day that passes before the general election represents a lost opportunity for DGA to engage in protected First Amendment activities.

90.     Defendants will suffer no irreparable harm if they are prevented from enforcing the Challenged Provisions and Rulings in an unconstitutional manner.

28

91.    An injunction would serve the public interest, as the public has a strong interest in vindicating constitutional rights.

92.    DGA has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, DGA respectfully requests that this Court grant the following relief:

   A.    An order declaring that

   (1)    The definition of expenditure found in Conn. Gen. Stat. § 9-601b(1), is unconstitutionally overbroad and vague and may only be enforced as applied to express advocacy and its functional equivalent as those terms have been interpreted by the U.S. Supreme Court;

   (2)    A candidate or a candidate's agent's non-earmarked solicitation or fundraising in association with or on behalf of DGA cannot give rise to a rebuttable presumption that an expenditure in support of that candidate that DGA either makes or provides for through a covered transfer is not an independent expenditure; and

   (3)    A candidate or a candidate's agent's non-earmarked solicitation or fundraising in association with or on behalf of DGA cannot be a basis for a finding of, or otherwise constitute evidence that an expenditure in support of that candidate that DGA either makes or provides for through a covered transfer is not an independent

29

expenditure.

B.     Preliminary and permanent injunctions enjoining Defendants, their

respective agents, officers, employees, successors, and all persons acting in

concert with each or any of them from:

> (1)     Implementing, enforcing or giving any effect to the definition of
>
> expenditure found in Conn. Gen. Stat. § 9-601b(1), except as
>
> it applies to express advocacy or its functional equivalent, as those
>
> terms have been interpreted by the Supreme Court;

> (2)     Implementing, enforcing or giving any effect to Conn. Gen. Stat. §
>
> 9-601c(c) to impose a rebuttable presumption that an entity's
>
> expenditure is not an independent expenditure based on non-
>
> earmarked "solicitation or fundraising on behalf of [an] entity by a
>
> candidate or an agent of the candidate" where "the entity has made
>
> or obligated to make independent expenditures in support of such
>
> candidate in the election or primary for which the candidate is a
>
> candidate"; and

> (3)     Relying on non-earmarked solicitation or fundraising on behalf of
>
> an entity by a candidate or a candidate's agent as a basis to find, or
>
> otherwise as relevant evidence of, coordination between the
>
> candidate and that entity or another to whom the entity makes a
>
> covered transfer.

C.  Costs and attorneys' fees pursuant to 42 U.S.C. § 1988 or any applicable

statute or authority; and

D.  Such other or further relief as this Court deems just, necessary or proper.

Dated: April 23, 2014                                    Respectfully submitted,

                                                         THE PLAINTIFF


                                                         By _David Rosen_____
                                                         David N. Rosen
                                                         David Rosen & Associates, P.C.
                                                         400 Orange Street
                                                         New Haven, CT 06511
                                                         (203) 787-3513
                                                         (203) 789-1605 Fax
                                                         drosen@davidrosenlaw.com
                                                         CT00196

                                                         PERKINS COIE LLP

                                                         Marc E. Elias (*Pro Hac Vice* Special
                                                         Admission Petition To Be Filed)
                                                         D.C. Bar No. 442007
                                                         melias@perkinscoie.com

                                                         Brian Svoboda (*Pro Hac Vice* Special
                                                         Admission Petition To Be Filed)
                                                         D.C. Bar No. 450081
                                                         bsvoboda@perkinscoie.com

                                                         Jonathan Berkon (*Pro Hac Vice* Special
                                                         Admission Petition To Be Filed)
                                                         D.C. Bar No. 992519
                                                         jberkon@perkincoie.com

Elizabeth C. Frost (*Pro Hac Vice* Special
Admission Petition To Be Filed)
D.C. Bar No. 1007632
efrost@perkinscoie.com

700 Thirteenth St., N.W., Suite 600
Washington, D.C. 2005-3960
(202) 654-6200
(202) 654-6211

*Counsel for the Plaintiff*