## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DEMOCRATIC GOVERNORS | : | |
| ASSOCIATION, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:14-cv-00544 (JCH) |
| | : | |
|     v. | : | |
| | : | |
| MICHAEL J. BRANDI, in his official | : | |
| capacity as Executive Director and | : | JUNE 10, 2014 |
| General Counsel of Connecticut's | : | |
| State Elections Enforcement | : | |
| Commission, et al., | : | |
|     Defendants. | : | |

### RULING RE: PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 10) & DEFENDANTS' MOTION TO DISMISS (Doc. No. 27)

### I.    INTRODUCTION

Plaintiff Democratic Governors Association ("DGA") has moved to preliminarily

enjoin the operation of sections 9-601b(a)(2) and 9-601c(c) of the Connecticut General

Statutes.  Plaintiff's Emergency Motion for Preliminary Injunction (Doc. No. 10).

Defendants Michael J. Brandi, Anthony J. Castagno, Salvatore Bramante, Patricia

Stanekevicius, Stephen Penny, and Michael J. Ajello, all in their official capacities as

officials of Connecticut's State Elections Enforcement Commission ("SEEC"); George

Jepsen, in his official capacity as Connecticut Attorney General; and Kevin T. Kane, in

his official capacity as Connecticut's Chief State's Attorney, oppose the Motion, and

have moved to dismiss DGA's Complaint.[1]  Defendants' Memorandum in Opposition to

---

[1] The Campaign Legal Center, Common Cause of Connecticut, Citizen Action Group, and The League of Women Voters of Connecticut, as amici curiae, also oppose DGA's Motion for Preliminary Injunction.   Memorandum of Campaign Legal Center, Common Cause of Connecticut, Connecticut Citizen Action Group, and The League Women Voters of Connecticut as Amici Curiae in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. No. 30-1).

Plaintiff's Motion for Preliminary Injunction ("Defs.' Opp.") (Doc. No. 28); Defendants'

Motion to Dismiss ("MTD") (Doc. No. 27).

The court notes, at the outset, that it has held a nearly-three-hours-long oral

argument, heard argument in a telephonic status conference, and received two rounds

of briefing from the parties.  Both sides argue that the other has shifted its position of

the issues presented, and the defense thereto, during the short life of this case.  The

court agrees with both DGA and the defendants in this regard: the case has appeared

at times to be a moving (or perhaps evolving) target, which has made an area of law—

one that appears to have challenged courts encountering it—all the more difficult.  In the

face of this, the court will seek to address only the issues raised by DGA in its

Memorandum in Support of its Motion for Preliminary Injunction, as supported by the

pleadings in its Complaint and as expressly requested in its proposed Order.

For the reasons stated below, the Motion to Dismiss is **GRANTED IN PART** and

**DENIED IN PART** and the Emergency Motion for Preliminary Injunction is **DENIED**.

## II.    FACTUAL BACKGROUND

### A.  DGA

DGA is the association of our nation's Democratic governors.  Complaint

("Compl.") (Doc. No. 1) at ¶ 1.  It identifies its major purpose as the promotion of

Democratic governors and their policies throughout the United States.  Id.  DGA is

organized as a not-for-profit unincorporated association under District of Columbia law

and is exempt from federal taxation under section 527 of the Internal Revenue Code.[2]

---

The Republican Party of Connecticut moved to intervene, and has filed an opposition to
DGA's Motion for Preliminary Injunction.  Motion to Intervene (Doc. No. 29).

[2]  Section 527 of the United States Code, Title 26 concerns taxation and tax exemption

2

Id. at ¶ 15.

In anticipation of this year's gubernatorial election in Connecticut, as well as after the election in Connecticut, DGA intends to: 1) make independent expenditures that expressly advocate for, or contain the functional equivalent of express advocacy for, the election and defeat of candidates for Governor in Connecticut; 2) make covered transfers[3] to other political committees for the purposes of making independent expenditures in Connecticut; and 3) make communications that discuss issues of public concern in Connecticut, and refer to candidates for Governor in Connecticut, but do not expressly advocate the election or defeat of any candidate or contain the functional equivalent of express advocacy.  Id. at ¶¶ 2, 30.  Some of DGA's planned communications, whether made directly by DGA or by political committees to which it makes covered transfers, will refer to candidates who have raised or will raise non-earmarked funds[4] for DGA's programs and activities, or will refer to these candidates' opponents.  Id. at ¶ 31.

To ensure that its independent expenditures and those supported by its covered

---

of "political organizations."  "Political organizations" are created with the primary purpose of directly or indirectly accepting contributions or making expenditures, or both, for the purpose of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to federal, state, or local public office.  26 U.S.C. § 527(e)(1), (2).

[3] "Covered transfers" are defined under section 9-601(29)(A) of the Connecticut General Statutes as "any donation, transfer or payment of funds by a person to another person if the person receiving the donation, transfer or payment makes independent expenditures or transfers funds to another person who makes independent expenditures."  Conn. Gen. Stat. § 9-601(29)(A).

[4] "Earmarked" is not defined in Connecticut's campaign finance law.  DGA Supplemental Memorandum ("DGA Suppl. Mem.") (Doc. No. 38) at Ex. A (SEEC Declaratory Ruling 2013-02), 2.  The SEEC has construed "earmarked" to "generally mean funds provided for the purpose of promoting or opposing the nomination or election of Connecticut candidates or political parties. Funds are considered earmarked when the person giving or receiving them has manifested an intention that they will be used to promote[,] attack[,] support[,] or oppose Connecticut candidates or parties."  Id. at 3.

transfers are not made in concert, coordination, or consultation with Connecticut candidates or parties, DGA has established a firewall policy designed and implemented to prohibit the flow of information between employees, consultants, and other individuals providing services to DGA related to the expenditure, and candidates or agents of the candidate benefiting from the expenditure.  Id. at ¶ 32; Memorandum in Support of Plaintiff's Emergency Motion for Preliminary Injunction ("Prelim. Inj. Mem.") (Doc. No. 11) at Ex. B (Declaration of Corey Platt in Support of Plaintiff's Emergency Motion for a Preliminary Injunction), ¶ 7.

    B.  <u>Connecticut's Campaign Finance Regulatory Scheme</u>

       1.  Expenditures

In 2013, the Connecticut General Assembly enacted Act No. 13-180, "An Act Concerning Disclosure of Independent Expenditures and Changes to Other Campaign Finance Laws and Election Laws."  2013 Conn. Legis. Serv. P.A. 13-180 (H.B. 6580). The Act amended Connecticut's election laws to create a new regulatory scheme governing persons that make independent expenditures; a number of provisions within this new scheme are at issue in this litigation.

Under Connecticut law, entities are limited in how much they may directly contribute to candidates for statewide office, including the governorship.  See, e.g., Conn. Gen. Stat. §§ 9-611, 9-613, 9-615.  Of the various forms of support for candidates that Connecticut defines as "contributions," the following are relevant here:

> (1) Any gift, subscription, loan, advance, payment or deposit of money or anything of value, made to promote the success or defeat of any candidate seeking the nomination for election, or election or for the purpose of aiding or promoting the success or defeat of any referendum question or the success or defeat of any political party; . . . (3) The payment

> by any person, other than a candidate or treasurer, of compensation for the personal services of any other person which are rendered without charge to a committee or candidate for any such purpose; [or] (4) An expenditure that is not an independent expenditure.

Conn. Gen. Stat. § 9-601a(a).

Entities may make unlimited "independent expenditures" unless otherwise restricted or prohibited by the law. Id. § 9-601d(a). Expenditures are defined as:

> (1) Any purchase, payment, distribution, loan, advance, deposit or gift of money   or anything of value, when made to promote the success or defeat of any candidate seeking the nomination for election, or election, of any person or for the purpose of aiding or promoting the success or defeat of any referendum question or the success or defeat of any political party;

> (2) Any communication that (A) refers to one or more clearly identified candidates, and (B) is broadcast by radio, television, other than on a public access channel, or by satellite communication or via the Internet, or as a paid-for telephone communication, or appears in a newspaper, magazine or on a billboard, or is sent by mail; or

> (3) The transfer of funds by a committee to another committee.

Conn. Gen. Stat. § 9-601b(a). An "independent" expenditure is an expenditure, as defined in section 9-601b(a), that is "made without the consent, coordination, consultation of, a candidate or agent of the candidate, candidate committee, political committee or party committee." Id. § 9-601c(a). Independent expenditures may expressly advocate for the election or defeat of a candidate ("express advocacy expenditures"), see id. § 9-601b(a)(1), or may advocate on issues only ("issue advocacy expenditures"), id. § 9-601b(a)(2). If an expenditure is not independent, Connecticut law treats it as a disguised in-kind contribution to a candidate; as such, it is subject to the same restrictions as all other contributions. Id. § 9-601a(a)(4).

5

For the purposes of evaluating whether an expenditure is truly independent, the law provides for a number of "rebuttable presumptions" that certain expenditures are <u>not</u> independent expenditures.  <u>Id.</u> § 9-601c(b).  The law also provides for certain activities that "shall not be presumed to constitute evidence of consent, coordination or consultation" in determining whether an expenditure is independent:

> (1) Participation by a candidate or an agent of the candidate in an event sponsored by the entity, unless such event promotes the success of the candidate's candidacy or the defeat of the candidate's opponent, or unless the event is during the period that is forty-five days prior to the primary for which the candidate is seeking nomination for election or election to office;

> (2) membership of the candidate or agent of the candidate in the entity, unless the candidate or agent of the candidate holds an executive or policymaking position within the entity after the candidate becomes a candidate; or

> (3) financial support for, or solicitation or fundraising on behalf of the entity by a candidate or an agent of the candidate, unless the entity has made or obligated to make independent expenditures in support of such candidate in the election or primary for which the candidate is a candidate.

<u>Id.</u> § 9-601c(c).

The rebuttable presumptions outlined in section 9-601c(b) may be effectively rebutted by "the establishment by the person making the expenditure of a firewall policy designed and implemented to prohibit the flow of information between (1) employees, consultants or other individuals providing services to the person paying for the expenditure, and (2) the candidate or agents of the candidate."  <u>Id.</u> § 9-601c(d).

The SEEC is empowered to make investigations on its own initiative or in response to statements or complaints filed with the Commission alleging violations of

any provisions of Connecticut's campaign finance laws.  Id. § 9-7b(a)(1).  It may also

levy civil penalties for violations of these laws.  Id. § 9-7b(a)(2).  Knowing and willful

violation of any provision of Connecticut's campaign finance laws is a class D felony.

Id. § 9-623(a).

    2.  Disclosure

    As part of its regulatory framework, Connecticut imposes disclosure and

registration requirements on independent expenditures exceeding one thousand dollars

in the aggregate.

    Section 9-601d(b) requires that, in an election or primary for a number of state

elective positions, including the office of Governor, any person who makes or obligates

to make independent expenditures in excess of one thousand dollars in the aggregate

must electronically file a long-form and short-form report of the expenditures.  Id. § 9-

601d(b).  The reports must be filed no later than twenty-four hours after the expenditure

is made, or after the obligation to make the expenditure is made.  Id.

    The long-form report must provide identifying and contact information for the

person making the independent expenditure; the date of the primary or election for

which the independent expenditure was made or is obligated to be made; the candidate

who is the subject of the independent expenditure; whether the independent

expenditure is in support of or in opposition to this candidate; and contact information

for the individual filing the report.  Id. § 9-601d(c).

    The short-form report must provide the name of the person making or obligating

to make the independent expenditure; the amount of the independent expenditure;

whether the independent expenditure was in support of or in opposition to a candidate

and, if so, the name of the candidate; a brief description of the expenditure made,

including the type of communication, based on categories determined by the SEEC; the

allocation of the expenditure in support of or in opposition to each candidate if the

independent expenditure was made in support of or in opposition to more than one

candidate; and identifying and contact information for the individual filing the report. Id.

§ 9-601d(d).  A person who makes an independent expenditure after filing a long-form

report must file a short-form report for that expenditure and all subsequent independent

expenditures.  Id. § 9-601d(d).

     If a person makes or obligates to make an independent expenditure in excess of

one thousand dollars during a time period other than the election or primary campaign

for a state elective position, that person must file statements according to the same

schedule and in the same matter as is required of a treasurer of a political action

committee under section 9-608.  Id. § 9-601d(a) (requiring filing of statements pursuant

to section 9-608).  A person who reports an independent expenditure pursuant to

section 9-601d(c) or 9-601d(d) is not required to file such a statement pursuant to

section 9-608 for this expenditure.  Id. § 9-601d(e) (exempting persons who qualify for

filing under sections 9-601d(c) and 9-601d(d) from filing pursuant to section 9-601d(a)).

Failure to comply with section 9-608 will result in a "fine of not less than two hundred

dollars or more than two thousand dollars or imprisonment for not more than one year,

or both."  Id. § 9-623(b)(4).

     Further, section 9-602 specifies that no contributions may be made, solicited, or

received, and no expenditures exceeding one thousand dollars—other than

independent expenditures—may be made, directly or indirectly, in aid of or in opposition

to the candidacy for nomination or election of any individual or any party or referendum question unless "the candidate or chairman of the committee has filed a designation of a treasurer and a depository institution situated in this state as the depository for the committee's funds," or "the candidate has filed a certification in accordance with the provisions of [the statute controlling the formation of candidate committee]."  Id. § 9-602(a).

    C. SEEC Rulings

       To ensure that it was in compliance with Connecticut's campaign finance laws, DGA (anonymously through its counsel) requested a number of declaratory rulings from the SEEC late last year.  Prelim. Inj. Mem. at 8 n. 2.  Of the questions DGA presented to the SEEC, two are relevant here: 1) whether a candidate's non-earmarked fundraising activity for an entity that makes "covered transfers" is a basis to find coordination between the candidate and the entity, and 2) whether any of these organizations—a 527 organization that does not accept earmarked donations to make independent expenditures for influencing Connecticut elections, a 527 organization that solicits and receives earmarked donations and is formed to make independent expenditures to influence Connecticut elections, or a 527 organization that receives and spends funds to do a number of things in addition to making independent expenditures to influence Connecticut elections, and accepts donations earmarked to make such independent expenditures—is required to register as a political committee under Connecticut's laws. See id. at 8; DGA Supplemental Memorandum ("DGA Suppl. Mem.") (Doc. No. 38) at 5; Prelim Inj. Mem. at Ex. A (SEEC Declaratory Ruling 2014-02), 1; DGA Suppl. Mem. at Ex. A (SEEC Declaratory Ruling 2013-02), 2.  To the former question, the SEEC

responded that such activity might, under some circumstances, constitute evidence of coordination.  Prelim Inj. Mem. at Ex. A (SEEC Declaratory Ruling 2014-02), 5.  On the latter question, the SEEC instructed that a 527 organization that solicits and raises donations to influence Connecticut elections is raising contributions, and thus must register as a political committee once it exceeds the one thousand dollar threshold outlined in section 9-602(a).  DGA Suppl. Mem. at Ex. A (SEEC Declaratory Ruling 2013-02), 21.

   D. <u>DGA's Claims of Constitutional Harm</u>

   DGA contends that section 9-601b(a) and section 9-601c(c) are facially violative[5] of the First Amendment.  It charges that the definition in section 9-601b(a) of "expenditure," which includes any communication that refers to a candidate for office, even if the communication lacks express advocacy or its functional equivalent, is unconstitutionally overbroad, vague, and contrary to the Supreme Court's instruction on what may be regulated as an "expenditure."  Prelim. Inj. Mem. at 30; Compl. ¶¶ 61-73.  Further, DGA asserts that section 9-601c(c), both by creating a presumption of illegal coordination from a candidate's mere association with a spender, and by permitting the SEEC to view this association as evidence of coordination, impermissibly regulates independent expenditures and burdens DGA's First Amendment rights.  Prelim. Inj. Mem. at 1, 24; Compl. ¶¶ 74-83.

   DGA requests that this court issue an order declaring that the definition of

_____

   [5] While DGA has not always been clear on this, it is a facial challenge that the court addresses here.  Upon direct inquiry of DGA's counsel as to whether this challenge was facial or as-applied, the court was told that DGA was pursuing a "facial" challenge.  Transcript (Doc. No. 31) at 12:15-17.

expenditure found in section 9-601b(a)[6] is unconstitutionally overbroad and vague and may only be enforced as applied to express advocacy and its functional equivalent; that non-earmarked solicitation or fundraising by a candidate or candidate's agent for DGA cannot give rise to a rebuttable presumption that an expenditure in support of that candidate that DGA either makes or provides for through a covered transfer is not an independent expenditure; and that a candidate's or candidate's agent's non-earmarked solicitation or fundraising with or for DGA cannot be a basis for a finding, or otherwise constitute evidence that, an expenditure in support of that candidate that DGA makes or provides for through a covered transfer is not an independent expenditure.  Compl. at 29.

DGA also requests that defendants be enjoined from implementing, enforcing, or giving any effect to section 9-601b(a)[7] to the extent that its definition of expenditure applies to issue advocacy; implementing, enforcing, or giving any effect to section 9-601c(c) to the extent that it creates a rebuttable presumption that DGA's expenditure is not independent based on DGA's participation in associational activities with a

---

[6] The court assumes that DGA's request that the court issue an order declaring the "definition of expenditure found in Conn. Gen. Stat. § 9-601b(1)," Compl. at 29, is actually a request for an order regarding section 9-601b(a), because the court finds no section 9-601b(1) in the Connecticut General Statutes.

[7] See supra note 6.  Much as with DGA's request for an order regarding "Conn. Gen. Stat. § 9-601b(1)," the court assumes that DGA's request that the court provide relief from the "implement[ation], enforce[ement], or giving [of] any effect to the definition of expenditure found in Conn. Gen. Stat. § 9-601b(1)," is actually a request for relief from the definition of expenditure found in section 9-601b(a).  Compl. at 30.  The court does not believe that DGA intended to limit its request to section 9-601b(a)(1) because section 9-601b(a)(2) also defines "expenditure." See Conn. Gen. Stat. § 9-601b(a)(2); see also infra note 11.  It further assumes that the proposed Order provision for relief from "the definition of expenditure found in Conn. Gen. Stat. § 9-601b," Prelim. Inj. Mem. at Ex. F, would specifically provide relief from the definition found in section 9-601b(a).  Section 9-601b(a) provides the definition of "expenditure," while the remainder of the statute addresses categories of valuable items that do not qualify as expenditures and clarifies terms within these categories.  Conn. Gen. Stat. § 9-601b(b)-(d).

candidate or agent of a candidate that are not specific to a particular expenditure, including DGA's participation in those activities outlined in section 9-601c(c); and relying on DGA's associational activities with a candidate or agent of a candidate that are not specific to a particular expenditure, including those activities outlined in section 9-601c(c), as a basis to find, or as relevant evidence of, coordination between the candidate and DGA or an entity to whom DGA makes a covered transfer.  Id. at  30.

III.    **STANDARD OF REVIEW**

A party seeking to obtain a preliminary injunction must demonstrate 1) that it is likely to succeed on the merits, 2) that it is likely to suffer irreparable harm in the absence of preliminary relief, 3) that the balance of equities tip in its favor, and 4) that an injunction is in the public interest.  New York Progress and Protection PAC v. Walsh, 733 F.3d 483, 486 (2013).  In the First Amendment context, the likelihood of success on the merits is the "dominant, if not dispositive, factor."  Id. at 488.

Where the requested preliminary injunction "would stay government action taken in the public interest pursuant to a statutory or regulatory scheme" and alter, rather than maintain, the status quo, the party must demonstrate a "substantial" or "clear" likelihood of success on the merits, or that "extreme or very serious damage will result from a denial of preliminary relief."  Id.; Bronx Household of Faith v. Bd. of Ed. of the City of New York, 331 F.3d 342, 349 (2d Cir. 2003); Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995).

IV.    **DISCUSSION**

A.    Standing

"'No principle is more fundamental to the judiciary's proper role in our system of

government that the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)).  This limitation requires, in part, that plaintiffs "'establish that they have standing to sue.'" Id. at 1146 (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)).

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" Id. at 1147 (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)).  A threatened injury must be "'certainly impending to constitute injury in fact,'" id. (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)); the imminence element of standing "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes," id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 565 n.2 (1992)).  "Literal" certainty that the harms a plaintiff fears are impending, however, may not be required: where there is a "substantial risk" that a harm will occur, prompting a plaintiff to reasonably incur costs to mitigate or avoid that harm, standing may be found.  Id. at 1150 n.5; Hedges v. Obama, 724 F.3d 170, 195-96 (2d Cir. 2013).

Two types of injuries may confer Article III standing for First Amendment challenges.  The first occurs when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979); Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (categorizing First Amendment injury creating Article III standing).  The

second occurs when a plaintiff is "chilled from exercising her right to free expression or foregoes expression in order to avoid enforcement consequences." Blum, 744 F.3d at 796 (internal quotation marks and citation omitted); Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 689 (2d Cir. 2013). "A plaintiff must allege something more than an abstract, subjective fear that his rights are chilled in order to establish a case or controversy. . . . But a real and imminent fear of such chilling is enough." Walsh, 714 F.3d at 689 (internal citation omitted).

    1.  Standing for DGA's Challenge to Section 9-601c(c)

DGA has argued that section 9-601c(c), and the SEEC's understanding of the statute as stated in its 2014-2 Declaratory Ruling, substantially burdens its exercise of its First Amendment rights because the statute requires the SEEC to treat a candidate's mere association with DGA as evidence of coordination, should certain conditions be met. DGA contends that it has standing because section 9-601c(c) creates a statutory presumption that DGA's intended conduct is evidence of illegal behavior, and thus provokes a "well-founded fear that the SEEC will subject [DGA] to prosecution or penalty due to its associational activities." Reply Memorandum in Support of Plaintiff's Emergency Motion for Preliminary Injunction ("Reply") (Doc. No. 32) at 5-6.

In DGA's view, section 9-601c(c)'s presumption also chills its ability to make independent expenditures because it stigmatizes DGA's involvement in the associational activities outlined in the statute by suggesting that such involvement is "illegal activity." Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Pl.'s MTD Opp.") (Doc. No. 35) at 11-12. DGA asserts that it has refrained from making independent expenditures that expressly

advocate for the election or defeat of Connecticut candidates for fear of the official stigma that section 9-601c(c) attaches to this activity.  Id. at 10.  DGA argues that this deterrence of its speech presents a cognizable injury for the purposes of Article III standing.  Id. at 9-10.

Defendants, however, argue that section 9-601c(c) cannot be plausibly read to create the "well-founded fear" of prosecution and chill that DGA has alleged.  "Nothing in the statutory scheme," according to the defendants, "requires the SEEC to presume, much less . . . require the SEEC to conclusively find that an expenditure is coordinated based solely on" the activities outlined in section 9-601c(c).  MTD at 18.

Whether DGA has standing to challenge section 9-601c(c), then, presents a question of statutory construction.  A district court interpreting a state statute must "carefully predict how the state's highest court would rule if confronted with the issue, including how it would resolve any ambiguity in the statute."  KLC, Inc. v. Trayner, 426 F.3d 172, 175-76 (2d Cir. 2005).  In doing so, the court employs traditional tools of statutory interpretation.  Id. at 176.  "Well-established principles of [statutory] construction dictate that statutory analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there. . . . In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  Puello v. Bureau of Citizenship and Immigration Services, 511 F.3d 324, 327 (2d Cir. 2007) (internal quotation marks and citations omitted); see also Conn. Gen. Stat. § 1-2z ("The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statute.").  A statute is plain and unambiguous when the

"meaning that is so strongly indicated or suggested by the statutory language as applied to the facts of the case that when the language is read as so applied, it appears to be the meaning and appears to preclude any other likely meaning." Kinsey v. Pacific Employers Ins. Co., 277 Conn. 398, 407-08 (2006) (internal quotation marks and citations omitted).

Neither a plain reading of section 9-601c(c) nor the SEEC's construction of the statute can support DGA's theories of standing for its challenge to section 9-601c(c). Section 9-601c(c), when read in the context of section 9-601c as a whole, can only be understood as establishing a "safe harbor" from the rebuttable presumptions of coordination outlined in section 9-601c(b), much like the firewall provision of section 9-601c(d). Section 9-601c(c) begins by establishing that, when the SEEC evaluates the independence of an expenditure, "the following shall not be presumed to constitute evidence of consent, coordination or consultation." Conn. Gen. Stat. § 9-601c(c) (emphasis added). The statute then lists three activities that will not be presumed evidence of coordination, unless certain conditions are met. Id. If the conduct in the "unless" clauses in section 9-601c(c) is triggered, the safe harbor against evidentiary presumptions created by the statute falls away. Id.

Contrary to DGA's representation of section 9-601c(c), triggering the "unless" clauses in section 9-601c(c) does not transform the activities outlined in the statute into presumptive evidence of coordination.[8] The "unless" clauses merely identify necessary

---

[8] The court notes that it would likely be unconstitutional for section 9-601c(c), or any other part of the statute, to treat associational activities of the type outlined in section 9-601c(c) as conclusively presumptive coordination. See Colorado Republican Federal Campaign Committee v. Fed. Election Com'n, 518 U.S. 604, 619 (1996) (finding conclusive presumption that expenditures were coordinated, merely because they were made by a political party,

conditions that must be met before the SEEC may consider the activities in section 9-601c(c) as evidence of coordination.  For example, under section 9-601c(c)(1), the SEEC cannot presume participation by a candidate or an agent of the candidate in an event sponsored by the entity to be evidence of coordination, unless the event promotes the success of the candidate's candidacy or the defeat of the candidate's opponent.  If the event promotes the success of the candidate's candidacy or the defeat of the candidate's opponent, then the SEEC <u>may</u>, but is not <u>required</u> to, consider the candidate's, or his or her agent's, participation as <u>evidence</u> of coordination.  An event that promotes a candidate's success or his or her opponent's defeat is a necessary, but not sufficient, condition for the SEEC to find that the candidate's participation in this event is evidence of coordination.   Thus, though section 9-601c(c) does create an imperative <u>against</u> treating certain activities as presumptive evidence of coordination, it cannot, logically, be read to treat the "unless" clause conduct as triggering a presumption of, or even presumptive evidence of, coordination.

The SEEC's interpretation of section 9-601c(c) is consistent with the court's reading.[9]  DGA asked SEEC whether non-earmarked fundraising by a candidate for an entity that made covered transfers could ever be a basis to find coordination.  Prelim.

---

unconstitutional).

[9] The court notes that, while federal courts and Connecticut courts generally give great deference to the judgment of administrative agencies that are in charge of enforcing a statute at issue, <u>see</u> <u>Chevron, U.S.A. v. Natural Resources Defense Council</u>, 467 U.S. 837, 844 (1984); <u>Burinskas v. Dep't of Social Services</u>, 240 Conn. 141, 147 (1997), "where a state statute is interpreted by a state administrative agency in the first instance and has not previously been subjected to judicial scrutiny, construction of the statute is a question of law, and the agency interpretation is not entitled to any special deference."  <u>Boy Scouts of American v. Wyman</u>, 213 F. Supp. 2d 159, 165-66 (D. Conn. 2002), <u>aff'd</u>, 335 F.3d 80 (2d Cir. 2003); <u>Burinskas</u>, 240 Conn. at 147.

Inj. Mem. at Ex. C (October 9, 2013 Request for Declaratory Ruling), 2.  Construing

section 9-601c(c)(1) in response, the SEEC observed that "the intent of the statute is

easily extrapolated: a candidate's non-earmarked fundraising activity for an entity that

makes 'covered transfers' is not presumed to establish coordination between the

candidate and the entity receiving such covered transfers."  Id. at Ex. A (SEEC

Declaratory Ruling 2014-02), 4 (emphasis in original). The SEEC, however, also

acknowledged that such fundraising, if accompanied by further evidence of an

agreement between the candidate and spender, could be suggestive of coordination.

Id. at 5.  This fundraising alone "would not prove coordination—nor would it even create

the presumption that there was coordination."  Id.  The SEEC simply noted that it was

"foreseeable that it might constitute evidence of a 'general understanding' among

actors."  Id.

What section 9-601c(c) and the SEEC's interpretation of the statute make clear is

that none of the associational activities, like those DGA has planned to engage in,

create a presumption of coordination; nor can any of these activities "in the absence of

other evidence[ ] be used to support a finding of coordination."  Pl.'s MTD Opp. at 22.

These activities, at most, may be evidence suggestive of coordination; a finding of

coordination can only be based on any such activity if additional evidence of

coordination is also present.

This court recognizes that, "[i]f a plaintiff's interpretation of a statute is reasonable

enough and under that interpretation the plaintiff may legitimately fear that it will face

enforcement of the statute, then that plaintiff has standing to challenge the statute."

Pacific Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008) (internal

quotation marks omitted).  However, DGA's proffered interpretation of section 9-601c(c) here is not supported by the plain language of or a reasonable reading of the statute itself, nor is the SEEC construing the statute as DGA does.  Thus, DGA's interpretation cannot be said to be "reasonable enough" to create a "legitimate[ ] fear that [DGA] will face enforcement of the statute."  Pacific Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008).

Because section 9-601c(c) cannot be read to proscribe DGA's participation in the associational activities outlined in the "unless" clauses, DGA's reliance on Vermont Right to Life Committee, Inc. v. Sorrell, 221 F.3d 376 (2d Cir. 2000), is of no effect.  In Vermont Right to Life, the Second Circuit found standing where the statute at issue contained an ambiguous phrase that could reasonably be understood to proscribe the plaintiff's conduct and, thus, subject the plaintiff to penalty should it refuse to comply. Vermont Right to Life, 221 F.3d at 382-83.  A statute that can reasonably be interpreted to proscribe a plaintiff's conduct is not analogous to section 9-601c(c), which is only an evidentiary statute.

As an evidentiary statute, section 9-601c(c) does not proscribe any conduct; and as it is drafted, it does not require any coordination inquiry to treat associational activities between a spender and a candidate as presumptive evidence of coordination. It merely outlines circumstances that a coordination inquiry cannot consider presumptive evidence of coordination.  If DGA participates in any of the associational activities described in the "unless" clauses, the SEEC may then consider this participation in its evaluation of whether an expenditure is coordinated, but it is by no means obligated to do so.  The SEEC, however, cannot base a finding of coordination

19

on this associational activity alone.  <u>Clapper</u> warns against endorsement of "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," 133 S. Ct. at 1141.  This court finds no compelling reason to disregard this warning by speculating as to whether the SEEC will find coordination if it investigates DGA's planned expenditures, let alone that it would do so based solely on associational activities, in contravention of the plain reading of section 9-601c(c), as well as its own articulated understanding of the statute.

Without a credible threat of prosecution posed by section 9-601c(c), DGA's theory of standing based on chill must fail.  To confer standing, a real and imminent fear of chilling of a plaintiff's rights must be fairly traceable to the statute at issue.  <u>Clapper</u>, 133 S. Ct. at 1147.[10]  In <u>Clapper</u>, respondents claimed standing based on the future injury posed by the possibility that a statute might be used to intercept their communications and on the present, ongoing injury created by the costly and burdensome measures they had adopted to protect the confidentiality of their communications from the risk of surveillance and interception.  <u>Id.</u> at 1142-43.  Finding that respondents' allegations of future injury rested upon a "highly attenuated chain of possibilities" and thus could not be said to be "certainly impending," the <u>Clapper</u> Court concluded that the costs respondents reported incurring, as a prophylactic to this future injury, were not fairly traceable to the statute.  <u>Id.</u> at 1151.

DGA's alleged threat of injury—prosecution for coordination based on its

---

[10] The court is aware that there are several bases on which <u>Clapper</u> may be distinguished from the facts at issue here.  <u>See</u> Pl.'s MTD Opp. at 12-14.  However, on this point, the Second Circuit is in accord with <u>Clapper</u>.  <u>See</u> <u>Nat'l Org. for Marriage v. Walsh</u>, 714 F.3d 682, 689 (2d Cir. 2013) ("[A] real and imminent fear of . . . chilling is enough" to establish a case or controversy.").

participation in the "unless" clause conduct of section 9-601c(c)—is similarly contingent on a "highly attenuated chain of possibilities."  For this injury to occur, the SEEC must elect to investigate DGA's independent expenditures, consider DGA's associational activities with a candidate as evidence of coordination, and, consistent with DGA's interpretation of the statute but in violation of the plain text itself as well as SEEC's construction of it, find coordination based on these associational activities alone.  DGA's allegations of chill, then, cannot be fairly traced to the plain meaning of section 9-601c(c) and are inconsistent with the SEEC's stated view of the statute, and thus do not provide for standing.  A plaintiff cannot "manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending." Id. at 1151.

DGA's contention that its speech has been chilled by the official stigmatization threatened by the possibility of prosecution under section 9-601c(c) does not persuade the court otherwise.  The court does not disagree that official stigmatization of conduct can have a chilling effect sufficient to create standing, see Meese v. Keene, 481 U.S. 465, 472-77 (1987), and, if section 9-601c(c) actually proscribed or provided that a spender's participation in associational activities with a candidate could alone be the basis for prosecution, the court would likely conclude that the threat of prosecution under section 9-601c(c) was sufficiently stigmatizing to confer standing.  Section 9-601c(c), however, does not actually threaten prosecution or any other officially stigmatizing consequence.  In Meese, it was undisputed that the allegedly protected activity at issue would fall, under the statute at issue, within the stigmatizing definition of "political propaganda."  481 U.S. at 473.  By contrast, nothing within section 9-601c(c)

or the record before the court supports the conclusion that the alleged stigmatizing consequences of the statute's enforcement—i.e., investigation and/or prosecution—of DGA for its participation in the "unless" clause conduct are impending, or likely to occur at all.

Because section 9-601c(c) cannot be read to pose any threat of injury to DGA on the sole basis of its participation in associational activities with a candidate, DGA lacks standing to challenge the statute.  On this ground, Defendants' Motion to Dismiss is granted and DGA's Motion for Preliminary Injunction is denied.

### 2.  Standing for DGA's Challenge to Section 9-601b(a)(2)

Unlike section 9-601c(c), enforcement of section 9-601b(a)(2)[11] against DGA is sufficiently impending to confer standing.  DGA has charged section 9-601b(a)(2) as unconstitutionally overbroad and vague; it claims that the statute's definition of "expenditure" fails to distinguish between expenditures made for express advocacy and those made for issue advocacy, and thus impermissibly regulates issue advocacy communications.   Compl. ¶¶ 61-73; Prelim. Inj. Mem. at 28-30.  DGA intends to sponsor communications on issues of public concern that refer to candidates in Connecticut, but do not expressly advocate their election or defeat, and to make covered transfers to political committees for the purpose of making similar

_____

[11] DGA has argued that it has standing to challenge section 9-601b(a)(2).  MTD Opp. at 22-23. The court notes that DGA's Complaint requests relief from "Conn. Gen. Stat. § 9-601b(1)," Compl. at 29-30, which the court treats, for reasons explained in supra notes 6 and 7, as a request for relief from section 9-601b(a).  Given that DGA has specifically asserted standing for section 9-601b(a)(2), and that DGA's substantive argument for the invalidation of section 9-601b(a) targets section 9-601b(a)(2)'s allegedly overbroad regulation of issue advocacy, see Prelim. Inj. Mem. at 30 (characterizing section 9-601b(a)(2) as "prima facie overbroad"), the court regards DGA's initial request for relief from section 9-601b(a) as actually a request for relief from section 9-601b(a)(2).

communications.  Compl. ¶ 30.  Such communications clearly fall within the parameters of section 9-601b(a)(2)'s definition of "expenditure."  See Conn. Gen. Stat. § 9-601b(a)(2) (defining expenditure as "any communication that . . . refers to one or more clearly identified candidates" and is broadcast by radio, television, internet, telephone, publication, or through mail).

Should DGA engage in such issue advocacy, it will be required to comply with Connecticut's disclosure statutes.[12]  The parties disagree about the nature of the burden such disclosures will impose on DGA.  Defendants assert that disclosure for non-solicited independent issue advocacy communications exceeding one thousand dollars is limited to incident reporting.  Defendants' Response to Plaintiff's Supplemental Memorandum (Doc. No. 39) at 6-8.  DGA alleges that it cannot make such communications without being forced to either register as a political committee or register as a lobbyist; it does not specify whether such communications will be solicited. Compl. ¶ 71.  Further, even if it is not required to register as a political committee or a lobbyist, DGA contends that Connecticut's regulation of issue advocacy through incident reporting is far broader than the First Amendment allows.  DGA's Supplemental Memorandum ("DGA Suppl.") (Doc. No. 38) at 11-13.

Regardless of the nature of the burden, however, it is undisputed that DGA will be subject to some burden, in the form of disclosure requirements, if it sponsors issue advocacy communications in Connecticut.  If the imposition of this burden is constitutionally impermissible, DGA will certainly suffer an injury if it forgoes its speech

---

[12] There are no limits placed on the amount of contributions that may be used to sponsor independent expenditures, including independent expenditures for issue advocacy.  See DGA Suppl. Mem. at Ex. A (SEEC Declaratory Ruling 2014-02), 22.

to avoid the disclosure requirement, if it makes such independent expenditures and complies with an unconstitutional disclosure requirement, or if it refuses to comply with the requirement and is subject to penalty for so doing.  See Walsh, 714 F.3d at 688 (defining an injury in fact as "an invasion of a legally protected interest" (internal citation marks omitted)).  DGA thus has a "certainly impending" injury sufficient for the purposes of standing in the form of a credible threat of prosecution or penalty.  In a pre-enforcement First Amendment action, "'[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder,' that plaintiff 'should not be required to await and undergo a . . . prosecution as the sole means of seeking relief.'"  Id. at 689-90 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

DGA alleges that the disclosure requirements that follow section 9-601b(a)(2)'s purportedly overbroad definition of "expenditure" have chilled its exercise of its First Amendment rights by deterring it from sponsoring issue advocacy communications.  Compl. ¶ 71; Prelim. Inj. Mem. at Ex. B, ¶ 20.  Because DGA will unquestionably be subject to some form of disclosure should it engage in issue advocacy communications, given section 9-601b(a)(2) and the disclosure requirements that attach to it, see Defendants' Response to Plaintiff's Supplemental Memorandum ("Defs.' Suppl. Mem.") (Doc. No. 39) at 4-8, the chill of DGA's speech here is "fairly traceable" to the statute it has challenged in this action.

Defendants insist that DGA lacks standing for its challenge to section 9-601b(a)(2) because, for DGA to suffer any injury under the statute, its planned

communications must first be characterized as "issue advocacy."  MTD at 25.

According to defendants, such a characterization cannot occur here because DGA has

presented no examples of the communications it plans to sponsor for evaluation of

whether they constitute "issue advocacy."  Defendants contend that the absence of

specific communications the DGA intends to make is fatal to its claim to standing,

because in Fed. Election Com'n v. Wisconsin Right to Life, 551 U.S. 449 (2007), the

case on which DGA's argument that section 9-601b(a)(2) is unconstitutional rests, the

Court had to consider the speech at issue before it could determine whether issue

advocacy expenditures could be regulated.  Id. at 26.  Without a showing that DGA's

planned communications can be properly characterized as issue advocacy, defendants

argue, DGA's allegations of injury can only be hypothetical.  Id. at 25.

Defendants' reliance on Wisconsin Right to Life in arguing against DGA's

standing on section 9-601b(a)(2), however, appears misplaced.  Wisconsin Right to Life

involved an as-applied challenge to section 203 of the Bipartisan Campaign Reform Act

of 2002, a statute that had previously been upheld as constitutional on a facial

challenge in McConnell et al. v. Fed. Election Com'n, 540 U.S. 93 (2003).  Wisconsin

Right to Life v. Fed. Election Com'n, 546 U.S. 410, 411-12 (2006).  It was the as-applied

nature of the challenge that required the Court to first determine whether the speech at

issue was pure issue advocacy, not the charge that section 203 was unconstitutional

itself.  Id. at 456, 465.  Nothing within Wisconsin Right to Life suggests that a party

would not have standing to bring a facial challenge based on the decision's discussion

of whether issue advocacy can be subject to the same regulation as express advocacy

or its functional equivalent.

DGA need not present planned issue advocacy communications to challenge the facial constitutionality of section 9-601b(a)(2).  As discussed above, mere intention to make such issue advocacy is sufficient to confer standing so long as DGA has a credible threat of injury.

B.  Section 9-601b(a)(2)

Regulation of independent expenditures may take two forms: limitations that restrict how much money can be spent on such expenditures, and disclosure.

Laws that burden political speech—including state limitations of political spending—are subject to strict scrutiny, which "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  Citizens United v. Federal Election Com'n, 558 U.S. 310, 340 (2010) (quoting Wisconsin Right to Life, 551 U.S. at 464 (opinion of Roberts, C.J.)).  Following the Supreme Court's most recent instruction on government regulation of political campaign speech, any such regulation can only target quid pro quo corruption, i.e., direct exchange of an official act for money, or its appearance.  McCutcheon v. Fed. Election Com'n, 134 S.Ct. 1434, 1441 (2014).

The state has "no anti-corruption interest in limiting independent expenditures." New York Progress and Protection PAC v. Walsh, 733 F.3d 483, 487 (2d Cir. 2013). The measure of an expenditure's independence is the degree to which it is controlled by or coordinated with a candidate.  "The absence of prearrangement and coordination of an expenditure with the candidate or his agent," that is, the independence of an expenditure, "not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper

commitments from the candidate."  Buckley, 424 U.S. at 47 (1976).   Thus, an

expenditure lacking in any coordination with the candidate also lacks in any potential for

actual or apparent quid quo pro corruption, and cannot be subject to statutory limits.

While independent expenditures cannot be limited in amount, the Supreme Court

has recognized that requiring disclosure of such expenditures can be permissible

regulation.  In Citizens United, the Court upheld a disclosure requirement imposed on

any person spending over a certain monetary limit on electioneering communications[13]

within a year; spenders were required to identify the person making the expenditure, the

amount of the expenditure, the election to which the communication was directed, and

the names of certain contributions. Citizens United, 558 U.S. at 366.   "Disclaimer and

disclosure requirements," the Court acknowledged, "may burden the ability to speak, but

they 'impose no ceiling on campaign-related activities,'" id. (quoting Buckley, 424 U.S.

at 64), and "'do not prevent anyone from speaking,'" id. (quoting McConnell, 540 U.S. at

201).

However, compelled disclosure of expenditures generally may impose

"significant encroachments on First Amendment rights," Buckley, 424 U.S. at 64, and

thus it is not without limit.  Disclosure requirements must survive "exacting scrutiny," that

is, there must be a "substantial relation" between a "sufficiently important" governmental

interest and the information required to be disclosed. Id. at 64 (internal quotation marks

omitted); Citizens United, 558 U.S. at 467 (internal quotation marks omitted).  Such

requirements are permissible where they do not "prevent anyone from speaking," and

---

[13] The statute at issue defined "electioneering communications" as "any broadcast, cable, or satellite communication that refers to a clearly identified candidate for Federal office and is made within 30 days of a primary or 60 days of a general election . . . [and] that is publicly distributed."  Citizens United, 558 U.S. at 321.

they perform a critical function by informing the public about the sources of election-related spending.  McConnell, 540 U.S. at 201; Citizens United, 558 U.S. at 366-67.

DGA contends that the Supreme Court has recognized "expenditure" as limited to communications that expressly advocate for the election or defeat of a candidate, or that are the functional equivalent of such advocacy, and that section 9-601b(a)(2)'s definition of expenditure, which is inclusive of issue advocacy communications, is unconstitutionally overbroad.  Prelim. Inj. Mem. at 30; Reply at 10-11.  In DGA's view, the failure of Connecticut's regulatory scheme to distinguish between express advocacy and issue advocacy thus impermissibly subjects uncoordinated issue advocacy communications to "the full range of [Connecticut's] campaign finance scheme"—namely, the disclosure requirements visited upon sponsors of certain expenditures.  Prelim. Inj. Mem. at 30 n.5; Reply at 11.

In the First Amendment context, a statute may be facially invalidated for over-breadth if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  U.S. v. Stevens, 559 U.S. 460, 473 (2010) (internal quotation marks omitted).  The overbreadth doctrine seeks to strike a balance between deterrence of constitutionally protected speech and the consequent inhibition of the free exchange of ideas on the one side, and the harmful effects that may extend from invalidating a law with constitutional applications on the other.  U.S. v. Williams, 553 U.S. 285, 292 (2008).  The over-breadth analysis generally proceeds by first construing the statute, then examining that construction for whether it proscribes a substantial amount of protected expressive activity.  Id. at 292, 297.

Where campaign finance laws are at issue, however, they unquestionably reach a substantial amount of protected speech because such laws "operate in a core free-speech zone and directly target protected speech."  Wisconsin Right to Life, Inc. v. Barland, 2014 WL 1929619, at *29 (7th Cir. May 14, 2014).  The question, then, becomes whether the statute at issue overreaches Buckley's instruction that the "government may regulate in th[is] area only with narrow specificity."  424 U.S. at 41 n. 48 (internal quotation marks omitted); see also Barland, 2014 WL 1929619, at *29.

In arguing that the definition "expenditure" is limited to communications that involve express advocacy or its functional equivalent, and cannot constitutionally reach communications that merely speak on issues of public concern, DGA relies almost exclusively upon Chief Justice Roberts' opinion in Wisconsin Right to Life that was not joined by the majority.  See Prelim. Inj. Mem. at 28-33; Wisconsin Right to Life, 551 U.S. at 476-504 (Roberts, C.J.; Alito, J. concurring).  Thus, Chief Justice Roberts' reflection that "[i]ssue ads . . . are by no means equivalent to contributions, and the quid-pro-quo corruption interest cannot justify regulating them," Wisconsin Right to Life, 551 U.S. at 478-79, provides guidance in determining whether issue advocacy communications may be regulated, but this court cannot treat it as binding precedent.

The express advocacy/issue advocacy distinction has its origins in Buckley.  There, the Court reviewed a statute that placed a monetary cap on expenditures "relative to a clearly identified candidate."  Buckley, 424 U.S. at 39.  Apprehensive of the possibility that reading "relative to" to mean simply "advocating the election or defeat" of a candidate might allow the statute to reach mere "discussion of issues," the Court found that the provision could be preserved against invalidation for vagueness only if it

was construed to "apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office."  Id. at 42-44.  The Court extended this construction of "expenditure" to a disclosure provision within the statute that captured expenditures made "for the purpose of influencing" the nomination or election of a candidate, after finding that "for the purpose of influencing" risked "encompassing both issue discussion and advocacy of a political result."  Id. at 76-79.  Following Buckley's limitation of the meaning of "expenditure" to avoid constitutional infirmity, the Court in Fed. Election Com'n v. Mass. Citizens for Life, 479 U.S. 238 (1986), construed a "more intrusive" statutory provision that "directly regulated independent spending"—by prohibiting corporations from using treasury funds to make expenditures "for the purpose of influencing any election"—to reach only expenditures that constituted express advocacy.  Id. at 248-49.

The McConnell Court, however, disavowed any suggestion that Buckley "drew a constitutionally mandated line between express advocacy and so-called issue advocacy."  540 U.S. at 190.  Characterizing Buckley's "express advocacy restriction" as an "endpoint of statutory interpretation, not a first principle of constitutional law," the McConnell Court declined to recognize the express advocacy/issue advocacy distinction as "drawing a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech."  Id. at 190, 192-93.  A statute that is "neither vague nor overbroad" need not "toe the same express advocacy line" as those in Buckley and Mass. Citizens for Life.  Id. at 192.

The statutory definition at issue in McConnell raised no such issues of vagueness.  While the plaintiffs in McConnell maintained that Congress could not

constitutionally require disclosure of "electioneering communications" without making an exception for issue advocacy communications, the Court found that the application of "electioneering communications" only to broadcasts clearly identifying a candidate for federal office, aired within a specific time period and targeted to an identified audience, raised no ambiguities or other challenges to comprehension that would merit a Buckley-like construction of its terms.  Id. at 194.

The mere fact that section 9-601b(a)(2) reaches issue advocacy communications, then, cannot be a basis to conclude that the statute is facially overbroad.  Section 9-601b(a)(2)'s definition of expenditure—as any communication that refers to one or more clearly identified candidates and is broadcast through various channels—does not suffer from the same ambiguity of terms that plagued the provisions at issue in Buckley and Mass. Citizens for Life.  Section 9-601b(a)(2) contains no phrases akin to the "relative to a clearly identified candidate" language in Buckley or the "for the purpose of influencing any election" language in Mass. Citizens for Life; it is not susceptible to varying interpretations, and instead clearly articulates the communications it reaches. Compare with McConnell, 540 U.S. at 194 (finding that statute that defined electioneering communications as "a broadcast . . . clearly identifying a candidate for federal office . . . aired within a specific time period, and . . . targeted to an identified audience of at least 500,000 viewers or listeners" was not vague and was instead easily understood and objectively determinable).

Further, the consequence of section 9-601b(a)(2) is simply one of disclosure.  As a "less restrictive alternative to more comprehensive regulations of speech," the imposition of disclosure requirements on issue advocacy communications has been

31

consistently upheld by the Court.  See Citizens United, 558 U.S. at 369 (rejecting the contention that disclosure requirements "must be confined to speech that is the functional equivalent of express advocacy"); see also National Organization for Marriage v. McKee, 649 F.3d 34, 54-55 (1st Cir. 2011) (finding that, "[I]n light of Citizens United . . . the distinction between issue discussion and express advocacy has no place in First Amendment review of" disclosure laws that require the divulgence of information to the public or state election commission but do not directly limit speech).

The disclosure statutes at issue here are not a model of clarity.  By the court's reading, a person making independent expenditures in an election or primary for the office of Governor that exceed one thousand dollars in the aggregate need only file a long-form report and short form report pursuant to section 9-601d(c) and (d).  Conn. Gen. Stat. § 9-601d(b).  Section 9-601d(a) appears to require that a person making such expenditures in excess of one thousand dollars outside of an election or primary must disclose these expenditures according to the same schedule and in the same matter as a treasurer of a political action committee.  Conn. Gen. Stat. § 9-601d(a). However, section 9-602 provides that a group that makes, solicits, or receives contributions, or that makes or incurs expenditures exceeding one thousand dollars cannot make any expenditures—other than independent expenditures—directly or indirectly for express advocacy unless "the candidate or chairman of the committee has filed a designation of a treasurer and a depository institution situated in this state as the depository for the committee's funds," "the candidate has filed a certification" in accordance with a statute governing the formation of a committee by a candidate, or the chairman of a political committee has filed a statement of organization.  Conn. Gen.

Stat. § 9-602(a).  Thus, a group that does not make, solicit, or receive contributions can make independent expenditures in excess of one thousand dollars, either outside or during an election or primary, without needing to register as a political committee, as stated in section 9-602(a).

The disclosure requirements that follow the definition of "expenditure" under section 9-601b(a)(2), i.e., the completion of a long-form report and a short-form report, are not unconstitutionally burdensome.  The information required to complete these forms is not unlike that required in the disclosure statute upheld in Citizens United, which required any person who spent more than ten thousand dollars on electioneering communications within a calendar year to file a statement identifying the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors.  558 U.S. at 366-67.  No further reports were required, unless an additional expenditure was made, id. at 366, just as is the case in section 9-601d(b) and section 9-601d(c).

DGA attempts to distinguish the disclosure statute in Citizens United from section 9-601d by arguing that section 9-601d regulates "too broad a class of issue communications."  DGA Suppl. Mem. at 11-12.  In Citizens United, DGA notes, the disclosure statute applied only to television and radio advertisements referring to candidates within 30 days of a primary or 60 days of a general election.  Id. at 12.  By contrast, section 9-601d reaches issue speech transmitted by the Internet, telephone, mail, newspaper, magazine, or billboard, as well as by television or radio.  Id.  Nothing within Citizens United, or McConnell, which originally upheld the disclosure statute at issue in both, suggested that the constitutionality of the statute was driven by the fact

that the statute reached only television and radio advertisements, see Citizens United, 558 U.S. at 367; McConnell, 540 U.S. at 200-02.  The court is not inclined to view section 9-601d's regulation of issue speech through additional mediums as a ground to distinguish it from McConnell and thus find section 9-601d unconstitutional.

DGA also argues that issue advocacy communications are subject to section 9-601d at any time of the year, rather than just 30 days before the primary or 60 days before the election, unless they fall within an exception; "making such [ ] communication[s]," according to DGA, "requires the sponsor to register as a 'lobbyist' and report its spending to the Office of State Ethics."  DGA Suppl. Mem. at 12.

The existence of this "lobbyist" exception is of no import to the question before the court.  First, the court understands the carve-out from the definition of "expenditure" that section 9-601b(b)(7)(A) creates for expenditures occurring more than 90 days before the election, or during a legislative session held inside the 90-day window, to be a prophylactic for lobbyists against compliance with section 9-601d's disclosure requirements.  Conn. Gen. Stat. § 9-601b(b)(7)(A).  It does not appear, by this court's reading, to be a cure for any constitutional defects in section 9-601b.  Cf. Citizens United, 558 U.S. at 337-41 (finding that statute unconstitutionally banned corporate speech, despite the fact that a political action committee created by a PAC could speak).  Second, if section 9-601b(a)(2) is unconstitutional, no "safety valve" provision that permits lobbyists to avoid disclosure would save it from its deficiencies.  See id. Third, DGA is not availing itself of the lobbyist exception; thus, defendants are correct to note that any assertions regarding these statutes—statutes, notably, that the SEEC does not enforce—are not appropriately raised in this challenge.  Defs.' Suppl. Mem. at

34

12.  The court thus considers only the burdens that the campaign finance statute imposes on issue advocacy speech.

Further, section 9-601d(b) appears to contain a time limit on when disclosures must be made that will not subject independent issue advocacy communications year-round to section 9-601d(c) and section 9-601d(d).  Long-form and short-form disclosures must be filed for any independent expenditure made "during a primary campaign or a general election campaign, as defined in section 9-700 . . . ."  Conn. Gen. Stat. § 9-601d(b).  Section 9-700(7) identifies the duration of a "general election campaign" as the "period beginning on the day following the primary and ending on the date the treasurer files the final statement for such campaign" in the case of a candidate nominated at a primary and, otherwise, "the period beginning on the day following the day on which the candidate is nominated and ending on the date the treasurer files the final statement for such campaign."  Id. § 9-700(7).  A "primary campaign" is defined as the period beginning on the day following the close of a convention, caucus, or town committee meeting held for the purpose of endorsing a candidate, and ending on the day of a primary held for the purpose of nominating a candidate.  Id. § 9-700(11).

Even if DGA is correct that Connecticut subjects issue advocacy communications to year-long disclosure, however, it provides nothing that supports its position that such disclosure is impermissible.  DGA submits that, in McConnell, the Court upheld the regulation of certain issue advocacy speech only because of the time-limited nature of the regulation.  Defs.' Suppl. Mem. at 13.  In McConnell, however, the Court noted only that plaintiffs' argument, that the justifications supporting the regulation of express advocacy did not apply to issue ads, failed because "issue ads broadcast during the 30-

35

and 60-day periods preceding federal primary and general elections are the functional equivalent of express advocacy."  540 U.S. at 206.  The Court there cited the time-bound nature of the communications at issue in response to an argument challenging a regulation barring the use of corporate funds to finance communications including issue ads, not to an argument challenging disclosure requirements.  Given the lesser scrutiny imposed upon disclosure requirements, the court does not find McConnell's discussion on this point instructive in this case.

DGA, however, takes greater issue with the political registration requirement that appears to be imposed on certain independent expenditures, including uncoordinated issue advocacy, that are made with solicited funds.  See supra IV.B at 32-33. Defendants assert that "[p]ersons who solicit and receive contributions earmarked to aid or oppose Connecticut candidates but who do not make contributions directly to such candidates or make expenditures coordinated with candidates and committees," are required to register as political committees.  Defs.' Suppl. Mem. at 4-5; DGA Suppl. Mem. at Ex. A (SEEC Declaratory Ruling at 2013-02), 14-22.  Thus, if DGA solicits and receives contributions—that is, anything of value made to promote the success or defeat of a candidate seeking nomination or election, per section 9-601a(a)—and uses these contributions to sponsor issue advocacy communications uncoordinated with any candidate, it will be required to register as a political committee once it raises or spends more than one thousand dollars.  Id.  Defendants characterize these committees as "independent-expenditure-only political committees."  Id.  Independent-expenditure-only political committees are not full political committees: they are required to meet disclosure requirements similar to those of full political committees, but are subject to

less regulation than full political committees because they are not limited in the amount of contributions they may accept.  Id. at 5; see Conn. Gen. Stat. §§ 9-612 through 9-620; DGA Suppl. Mem. at Ex. A (SEEC Declaratory Ruling 2013-02), 22.

DGA protests registration as such a quasi-political committee on the grounds that doing so imposes severe burdens on its operations as an organization.  DGA Suppl. Mem. at 5-11.  Registration as a political committee requires, among other things, the designation of a treasurer who is an "elector" in Connecticut. Conn. Gen. Stat. § 9-606(d).  The treasurer is responsible for a host of duties, including depositing, receiving, and reporting all contributions; making and reporting expenditures; reporting expenses; recordkeeping; remitting anonymous contributions to the SEEC; and preserving all internal records of transactions for four years from the date in which the transactions were entered.  Id. §§ 9-606; 9-607.  Political committees must also file ongoing disclosure reports at quarterly intervals.  Id. § 9-608(a)(1).

In its review of a law that prohibited corporations from making independent expenditures for express advocacy communications or electioneering communications, but permitted such corporations to create Political Action Committees ("PACs") for these purposes, the Citizens United Court observed that having to establish a separate PAC to engage in express advocacy or broadcast "electioneering communications" within 30 days of a primary and 60 days of a general election was a "burdensome alternative[ ]." 558 U.S. at 337.  PACs, the Court noted, were "expensive to administer and subject to extensive regulations" such as the need to "appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making donations, preserve receipts for three years, . . . file an organization statement . . . [and]

file detailed monthly reports with the FEC." Id. at 337-38.  The Court thus found that, given the onerous restrictions that accompanied PACs, the PAC exemption did not obviate the law's ban on speech. Id. at 339-40.  A corporation, even after establishing a PAC, was not allowed to speak. Id. at 337. Citizens United, however, did not opine on whether speakers could be subjected to the requirements of PACs as a form of disclosure.

The courts that have reached this question have not found the additional reporting and organizational burdens that accompany political committee registration to be unconstitutional.  In SpeechNow.org v. Fed. Election Com'n, 599 F.3d 686 (D.C. Cir. 2010), the D.C. Circuit found that designation of a treasurer and retention of records requirements did not "impose much of an additional burden" on the plaintiff.  599 F.3d at 435.  In McKee, the First Circuit held that a PAC provision that required an entity that received contributions or made expenditures exceeding a certain threshold for the purpose of promoting, defeating, or influencing a candidate's election to file a registration form disclosing basic information and name its treasurer and other officers, fundraisers, and decisionmakers, quarterly reporting of election-related contributions and expenditures, and simple recordkeeping by the treasurer, did not "prohibit, limit, or impose any onerous burdens on speech."  649 F.3d at 42-43, 56. The court determined that these reporting requirements were "well tailored" to the state's informational interest in providing the electorate with information regarding where political campaign money comes from and how it is spent. Id. at 58.   The Eleventh Circuit, in Worley v. Florida Sec'y of State, 717 F.3d 1238 (11th Cir. 2013), similarly concluded that periodic reporting requirements, registration involving the submission of basic information

regarding the organization, appointing a treasurer, and recordkeeping were not "unduly burdensome" on even small organizations raising funds to spend on ads opposing statutes in the state's general election.[14]  717 F.3d at 1250-51.

These cases recognize that even the additional disclosure and reporting requirements that political committee registration may present for speakers is constitutional permissible, so long as these requirements are substantially tailored to a sufficiently important government interest.  Disclosure requirements have long been recognized as "justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending."  Citizens United, 558 U.S. at 367 (quoting Buckley, 424 U.S. at 66); McCutcheon, 134 S. Ct. at 1459.  "They may also 'deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.'"  McCutcheon, 134 S. Ct. at 1459 (quoting Citizens United, 558 U.S. at 366).  Defendants have articulated the state's interest in its campaign finance regulatory scheme as "providing the public and regulators with information regarding who is speaking in aid or opposition to a Connecticut candidate, who is funding that speech and who provided financial support to others for the making of that speech."  Defs.' Suppl. Mem. at 2.

---

[14] The Eighth Circuit has held that the imposition of PAC registration requirements on entities that are not organized for the "major purpose" of nominating or electing a candidate is unconstitutional.  See e.g., Iowa Right to Life Committee, Inc. v. Tooker, 717 F.3d 576, 601 (8th Cir. 2013); Minnesota Citizens Concerned for Life v. Swanson, 692 F.3d 864, 877, 877 n.11 (8th Cir. 2012).  There is a circuit split on this issue.  See Ctr. for Individual Freedom v. Madigan, 697 F.3d 464, 490 (7th Cir. 2012) (rejecting the "major purpose" of an entity as a basis for determining whether disclosure requirements were overbroad); Swanson, 717 F.3d at 601 (noting circuit split); Tooker, 717 F.3d at 591 (same).

Notably, DGA is organized as a "political organization" under section 527 of the Internal Revenue Code; such organizations, as noted in Section A.II, are created for the purpose of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to federal, state, or local public office.  Compl. ¶ 15; 26 U.S.C. § 527(e)(1)-(2).

Connecticut's political committee registration requirements are not significantly different from those upheld in SpeechNow.org, McKee, and Worley. Disclosure of the source of independent expenditures funded by solicited contributions is certainly tailored to the state's interest in informing the electorate about the sources of election-related spending. The capacity of contributors outside of entities like DGA to influence the election of a candidate by providing money for this sole purpose supports more substantial disclosure for such contribution-funded independent expenditures than that required of independent expenditures funded by the entities themselves, or by an individual acting alone.

However, the court must note that, contrary to defendants' position, none of the hypotheticals presented to the court by DGA of potential issue advocacy expenditures that might be burdened by the political committee registration requirement would actually be subject to this requirement because none of the hypotheticals involves an independent expenditure funded by contributions solicited for the purpose of influencing the election of a candidate. Defendants claim that DGA's hypothetical of a television advertisement that named a candidate, but made no mention of electing or opposing the election of that candidate or any other, was funded by money solicited from individuals with a known interest in the subject matter of the ad, and was entirely uncoordinated,[15] would trigger the political committee registration requirement because in it, DGA "solicited contributions to aid or oppose a Connecticut candidate." Defs.' Suppl. Mem. at 9. The hypothetical, however, does not suggest, in any way, that DGA solicited the

---

[15] While DGA's hypotheticals apparently fell outside of the time period requiring disclosure, see Defs.' Suppl. Mem. at 8-9, the court assumes that the advertisement described in this hypothetical, for the purposes of this analysis, would be run within the relevant time period triggering disclosure.

funds supporting the ad for the purpose of electing or opposing a candidate; DGA states only that the five individuals from which it solicits funding have a "known interest" in the legislation at issue in the ad.  DGA Suppl. Mem. at 1.  Based on section 9-602(a) and defendants' own representations, see Defs.' Suppl. Mem. at 6 (noting the persons who "do not solicit contributions earmarked for the purpose of aiding or opposing Connecticut candidates," and who do not coordinate with candidates, "are not required to form political committees"), the court does not understand the political registration requirements imposed by Connecticut's campaign finance regulatory scheme to reach an independent expenditure like that described in this hypothetical—i.e., an independent expenditure that is not funded by solicited contributions earmarked for the purpose of promoting or opposing the election of a candidate.

Whether DGA (or another spending entity) would prevail on an as-applied challenge is not the issue before this court.  On a facial challenge, however, where the constitutional scrutiny must be confined to the statutes alone, a court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."  Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008) (quoting United States v. Raines, 362 U.S. 17, 22 (1960)). "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.'"  Id. (quoting Raines, 362 U.S. at 22).  In recognition of the need for, and wisdom of, judicial restraint in facial challenges such as this one, the court cannot conclude that DGA has clearly established the likelihood that it will prevail on the merits

in demonstrating that section 9-601b(a)(2) is overbroad, in either the class of speech it reaches or in the form of disclosure that is imposed upon certain categories of this speech.

Because DGA has not shown that it is substantially or clearly likely to succeed in its challenge to section 9-601b(a)(2), the court need not consider the other factors of the preliminary injunction inquiry.  Thus, DGA's Emergency Motion for Preliminary Injunction is **DENIED**.

## V.    CONCLUSION

For the reasons aforementioned, defendants' Motion to Dismiss (Doc. No. 27) is **GRANTED IN PART** and **DENIED IN PART** and DGA's Emergency Motion for Preliminary Injunction (Doc. No. 10) is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 10th day of June, 2014.

_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge